EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Margarita Rosado Muñoz<br>David Rosado Núñez<br>Christopher Rosado Goldstone<br>como miembro de la Sucesión<br>Julio Rosado del Valle<br><br>Peticionarios<br><br>v.<br><br>Sonia Acevedo Marrero<br><br>Recurrida | Certiorari<br><br>2016 TSPR 236<br><br>196 DPR ____ |

Número del Caso: CC-2014-1003


Fecha: 23 de noviembre de 2016


Tribunal de Apelaciones:

    Región Judicial de Bayamón, Panel Especial


Abogados de la parte Peticionaria:

    Lcda. María Teresa Szendrey Ramos
    Lcda. Maricarmen Ramos de Szendrey
    Lcdo. Juan J. Hernández López de Victoria


Oficina de la Procuradora General:

    Lcda. Margarita Mercado
    Procuradora General

    Lcda. María Astrid Hernández Martínez
    Procuradora General Auxiliar


Materia: Derecho de Familia: Carácter privativo de obras de arte creadas durante la vigencia de la sociedad legal de bienes gananciales.
Propiedad intelectual: Alcance de la propiedad sobre obras físicas.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Margarita Rosado Muñoz,<br>David Rosado Núñez,<br>Christopher Rosado Goldstone<br>Como miembro de la Sucesión<br>Julio Rosado del Valle<br><br>    Peticionarios<br><br>        v.<br><br>Sonia Acevedo Marrero<br><br>    Recurrida | CC-2014-1003 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada Señora PABÓN CHARNECO

En San Juan, Puerto Rico a 23 de noviembre de 2016.

Hoy examinamos un asunto de primera impresión en nuestro ordenamiento jurídico: si las obras de arte creadas por un artista durante la vigencia de una Sociedad Legal de Gananciales -y que poseía al momento de su muerte- son de carácter privativo o ganancial.

La propiedad intelectual es muy singular y distinta de otros géneros de bienes. *Ossorio Ruiz v. Srio. de la Vivienda*, 106 DPR 49 (1977). Su singularidad nos obliga a rebasar las nociones tradicionales del término "propiedad", entre otras razones, porque nuestro ordenamiento jurídico la protege por su particular

contribución social, y en el caso de las obras de arte plástico, por su valor estético y cultural.[1]

Por lo tanto, esta controversia requiere que repensemos nuevamente el contenido y la titularidad de los derechos de autor y, a su vez, que evaluemos las bases en las que se ha asentado históricamente el régimen legal de gananciales. Las leyes federales y estatales sobre propiedad intelectual ni las disposiciones del Código Civil aplicables a la Sociedad Legal de Gananciales atienden expresamente el alcance y la relación de la propiedad intelectual y este régimen económico. Por otro lado, nuestra jurisprudencia se ha limitado a declarar el carácter personalísimo del derecho moral de autor y el haz de facultades que este conlleva.

Examinemos entonces el derecho aplicable en aras de armonizar los intereses en conflicto: por un lado, la presunción de gestión conjunta y gananciabilidad del resultado del trabajo de los cónyuges que permea en el

---

[1] Exposición de Motivos, Ley Núm. 96 de 15 de julio de 1988, según enmendada, conocida como *Ley de Propiedad Intelectual de Puerto Rico*, 31 LPRA sec. 1401 *et seq.* (Derogada). Por su parte, la Exposición de Motivos de la Ley Núm. 55-2012, conocida como *Ley de Derechos Morales de Autor de Puerto Rico*, 31 LPRA sec. 1401j *et seq.*, expresa que:

> "Nuestros artistas juegan un importante papel en capturar la esencia de nuestra cultura y dejarla plasmada para futuras generaciones. Existe un interés en definir claramente los derechos de los artistas, tanto para beneficio de éstos como para el del público en general. El acceso a las obras artísticas debe ser una prioridad para una sociedad. Además, debemos enfatizar que estos derechos pertenecen al autor y el Estado debe facilitar lo que éste desee hacer con su creación y no limitar sus capacidades. El Estado debe reenfocar sus esfuerzos en aquello que redunde en una mayor promoción de las artes, flexibilizando el flujo de obras, cuidando el balance entre el acceso de la sociedad a una obra y el control de quien la genera".

régimen de gananciales, y por otro lado, el reconocimiento de la titularidad y gestión exclusiva que se le atribuye a la propiedad intelectual.

Adelantamos que las obras no sujetas a un contrato de explotación económica o que no hayan sido cedidas a la muerte del autor, pertenecen exclusivamente a su autor y por consiguiente al caudal hereditario, mas no así los frutos, rentas o intereses que generaran las obras creadas antes o durante la vigencia del matrimonio, y todo otro derecho que le sea reconocido a la sociedad legal de gananciales por nuestro ordenamiento jurídico. Esto a pesar de que para su creación se hubieren dispuestos fondos del caudal común o bienes obtenidos por la industria, sueldo o trabajo de los cónyuges.

I

El maestro Julio Rosado del Valle (el maestro Rosado del Valle), fue un reconocido artista puertorriqueño, con una importante producción de obras, particularmente pinturas.

El maestro Rosado del Valle falleció intestado el 20 de septiembre de 2008 y le sobrevivieron sus hijos, Margarita Rosado Muñoz, Gabriel Rosado Muñoz y David Rosado Nuñez.[2] También le sobrevivió su viuda, la Sra. Sonia Acevedo Marrero (la señora Acevedo Marrero) con quien contrajo matrimonio bajo el régimen de gananciales

---

[2] El Sr. Gabriel Rosado Muñoz falleció pendiente este litigio.

el 9 de marzo de 2001 y a la que el tribunal declaró heredera en la cuota viudal correspondiente.[3]

El 6 de abril de 2009, los descendientes del maestro Rosado del Valle (sus hijos, Margarita y David Rosado Muñoz, y su nieto Christopher Rosado Goldstone, en conjunto, "parte peticionaria") presentaron una Demanda para la liquidación de la Sociedad Legal de Gananciales y partición de la herencia contra la señora Acevedo Marrero.[4] Reclamaron toda la Obra producida por este antes y durante el matrimonio. Sostuvieron que las obras o la compensación recibida por las mismas previo a la fecha en que contrajo matrimonio con la señora Acevedo Marrero, así como todas las obras creadas durante su matrimonio, eran privativas por constituir propiedad privativa y moral. Por lo tanto, como herederos del maestro Rosado del Valle indicaron que eran los dueños de la Obra y que el único derecho que

---

[3] La relación entre la señora Acevedo Marrero y el maestro Rosado del Valle comenzó alrededor del 1987 como una comercial. Ella se desempeñaba como oficial y posteriormente como gerente de un banco. En esta capacidad manejaba las cuentas del maestro Rosado del Valle. Para 1998 comenzaron una relación sentimental y el 9 de marzo de 2001 contrajeron nupcias. El matrimonio perduró hasta la muerte del maestro Rosado del Valle a sus ochenta y seis (86) años el 20 de septiembre de 2008. Apéndice de la Petición de *Certiorari*, pág. 473. Por otro lado, indica la parte recurrida que "[l]a venta de las obras estaba a cargo del Causante, de la Recurrida y del hijo mayor de la compareciente, Johann Hertell Acevedo". Oposición, pág. 6.

[4] A la muerte del maestro Rosado del Valle, doscientos setenta y cuatro (274) obras creadas por él en distintas épocas se encontraban principalmente en la residencia conyugal propiedad de la Sra. Sonia Acevedo Marrero. Apéndice de la Petición de *Certiorari*, pág. 473. Un número significativo de obras que el maestro Rosado del Valle creó durante su vida fueron destruidas o afectadas por un fuego en un almacén que alquilaba. *Id*. Esto conllevó que este y su esposa se unieran como partes al pleito "*Sylvia Font v. Mini Warehouse y otros*, Civil Núm. F DP2000-0609". Las obras restantes estaban en un estudio del maestro Rosado del Valle en Barcelona, España, y otras trece (13) obras se encontraban en el Museo de Arte de Puerto Rico. Apéndice de la Petición de *Certiorari*, pág. 1480.

tenía la señora Acevedo Marrero sobre estas era el usufructo viudal.

Por su parte, la señora Acevedo Marrero presentó una Moción de Sentencia Sumaria el 2 de julio de 2009. Arguyó que tenía derecho a la mitad de todo lo producido por el trabajo, esfuerzo e industria de su esposo. Asimismo, presentó su Contestación a la Demanda el 21 de julio del mismo año. La señora Acevedo Marrero reclamó bajo distintas teorías derechos sobre ciento noventa y siete (197) de las doscientos setenta y cuatro (274) obras que se encontraban en la residencia conyugal. En primer término, alegó que ciento seis (106) obras creadas durante su matrimonio pertenecían a la Sociedad Legal de Gananciales ya que el maestro Rosado del Valle se dedicaba a la pintura. En segundo lugar, sostuvo que treinta y cinco (35) obras le pertenecían de manera privativa por recibirlas como regalo antes de contraer matrimonio, y que otras cincuenta y seis (56) obras le pertenecían por concepto de regalo durante la vigencia del matrimonio, ya sea por serles obsequiadas en ocasiones especiales o en momentos de regocijo familiar. En cuanto a las obras creadas antes del matrimonio, admitió que su único interés era el usufructo viudal sobre la compensación que se obtuviera de ellas.

Luego de evaluar la Moción de Sentencia Sumaria y la Oposición a la misma, el tribunal denegó la moción mediante Resolución de 22 de diciembre de 2009. "[A]nte la

complejidad de las controversias presentadas y ante el acuerdo de las partes, el Tribunal de Primera Instancia ordenó bifurcar los procedimientos y limitarse en esta etapa a dilucidar la controversia sobre la titularidad de las obras, dejando el asunto de su valoración y la división de la Sociedad Legal de Gananciales para una segunda etapa".[5] Así las cosas, el Tribunal de Primera Instancia celebró la vista para resolver lo relacionado a la titularidad de cada obra.[6]

Mediante Sentencia Parcial de 27 de septiembre de 2012, copia de cuya notificación fue archivada en autos el 1 de octubre de 2012, el Tribunal de Primera Instancia determinó que le correspondían a la señora Acevedo Marrero: nueve (9) obras que la parte peticionaria reconoció que le fueron regaladas por el maestro Rosado del Valle; otras doce (12) obras que esta adquirió como regalo antes de contraer matrimonio, y tres (3) obras que le fueron regaladas durante su matrimonio en ocasión de regocijo. No obstante, el foro primario determinó que las obras restantes correspondían al caudal relicto, así como los derechos de autor -morales y patrimoniales- de todas las obras del maestro Rosado del Valle. Concluyó que las obras creadas vigente el matrimonio y no sujetas a un

---

[5] Apéndice de la Petición de *Certiorari*, pág. 470.

[6] Cabe señalar que el presente caso ha sido objeto de distintos trámites que han atrasado su resolución. Entre otras cosas, la señora Acevedo Marrero ha presentado cinco (5) recursos ante el Tribunal de Apelaciones y uno (1) ante el Tribunal Federal de Quiebras. En este último solicitó la venta de las obras.

contrato de explotación, eran privativas por tratarse de un derecho personalísimo y exclusivo de su autor.

Inconforme y luego de varios trámites, la señora Acevedo Marrero presentó un Recurso de Apelación ante el Tribunal de Apelaciones el 8 de febrero de 2013. El mismo fue acogido como *certiorari* el 11 de abril de 2013.

El 16 de septiembre de 2014, el Tribunal de Apelaciones emitió una Sentencia en la que, luego de analizar tratadistas y jurisprudencia francesa, concluyó que "además del valor económico de las obras de arte, percibido o no durante la vigencia del matrimonio, procede incluir en la masa ganancial sujeta a liquidación, el soporte donde está plasmada la obra de arte, así como la obra de arte en sí".[7] Esto pues, razonó por un lado que los bienes obtenidos por la industria, sueldo o trabajo de los cónyuges se reputaban gananciales, y por el otro, que el *Federal Copyright Act*, infra, distinguía entre la titularidad del derecho de propiedad intelectual y la titularidad del medio tangible de expresión donde estaba plasmada la obra. Asimismo, reconoció que a la señora Acevedo Marrero le pertenecían las restante catorce (14) obras que ella reclamaba que le fueron regaladas por su esposo antes de contraer matrimonio. La Sentencia también concluyó que otras cinco (5) piezas le pertenecían por tratarse de donaciones válidas entre cónyuges.

---

[7] Apéndice de la Petición de *Certiorari*, pág. 21. La Sentencia fue notificada el 22 de septiembre de 2014.

Oportunamente la parte peticionaria presentó una Moción de Reconsideración que fue denegada el 15 de octubre de 2015. Inconforme, la parte peticionaria presentó ante este Tribunal el recurso de *certiorari* que nos ocupa y planteó la comisión de los errores siguientes:

1. El Honorable Tribunal de Apelaciones actuó sin autoridad al considerar el recurso ante sí, pues la ley no le confiere jurisdicción para resolverlo como apelación, ni como *certiorari*, lo que quedó probado con la total ausencia de análisis y justificación para su defectuoso ejercicio de discreción.[8]

2. El Tribunal de Apelaciones erró al determinar que el maestro le donó <u>oralmente</u> a la recurrida catorce obras que le había negado el TPI, resolviendo incorrectamente que los regalos quedaron establecidos sin prueba de su entrega simultánea en el acto de donación.

3. El Tribunal de Apelaciones erró seriamente al concluir que el Maestro le donó <u>oralmente</u> a la recurrida cinco obras de artes que le negó el TPI, a pesar de que tales donaciones entre cónyuges, de haberse perfeccionado, no fueron regalos módicos en ocasión de regocijo familiar.

4. Erró el Tribunal de Apelaciones al decidir que la creación artística de un autor producida durante el matrimonio es un bien de naturaleza ganancial negándole efectividad a la Ley de Derechos Morales de Autor de Puerto Rico y reconociéndole derechos y prerrogativas exclusivas del autor a la Sociedad de Bienes Gananciales.

---

[8] Examinado el primer señalamiento de error presentado por la parte peticionaria, encontramos que la Sentencia emitida por Tribunal de Primera Instancia cumple con la Regla 42.3 de Procedimiento Civil, 32 LPRA Ap. V.

Ante nos la parte peticionaria sostiene que el efecto práctico de la determinación del Tribunal de Apelaciones "es decretar la cotitularidad en el origen y una coadministración *de facto* de la propiedad intelectual personalísima del maestro [Rosado del Valle]".[9] Plantean que "[e]se decreto es contrario a la *Ley de Derechos Morales*, así como, al Código Civil de Puerto Rico, y sostenerlo implicaría irremediablemente reconocerle al cónyuge no autor, en virtud de una supuesta gananciabilidad, prerrogativas e injerencias con relación a la obra que son exclusivas y personalísimas del cónyuge autor".[10] Por lo tanto, indica que no se debe reconocer al cónyuge no autor un interés propietario sobre la expresión personal de su consorte previo a que esta sea enajenada por primera vez por el autor dado que la ley solo reconoce la co-autoría intelectual de una obra.[11] Distingue que en este caso, a diferencia de lo que ocurre con otros bienes muebles, las obras de arte en controversia constituyen la expresión de la personalidad de uno de los cónyuges. 31 LPRA Secs. 1191 y 1193. No obstante, reconoce el derecho de la Sociedad Legal de Gananciales a un crédito por el costo de los materiales utilizados por el cónyuge autor, así como los frutos del traspaso voluntario y válido de la obra.

---

[9] Alegato de la parte peticionaria de 23 de julio de 2015, pág. 23.

[10] Id.

[11] Id., págs. 26 y 28.

A *contrario sensu*, la señora Acevedo Marrero arguye que "los medios tangibles donde se plasman obras de arte durante el matrimonio son de carácter ganancial y ello no afecta de forma alguna los derechos morales y patrimoniales del cónyuge autor y/o sus causahabientes sobre las obras".[12] Esto pues, "el cónyuge autor tendrá las mismas limitaciones sobre las obras [sic] que un particular que hubiese comprado las mismas".[13] Sostiene su razonamiento en que todo bien que sea producto de la industria o trabajo de alguno de los cónyuges será considerado como un bien ganancial, *inter alia*, la obra artística y/o los medios tangibles en los que esta se plasmara de conformidad con el Artículo 1301(2) del Código Civil, 31 LPRA sec. 3641(2).[14] Segundo, indica que la Sección 202 de la Federal Copyright Act, 17 USC sec. 202, distingue entre la titularidad del derecho de propiedad intelectual y la del medio tangible de expresión. Es decir, sostiene que ser dueño del objeto en ninguna forma conlleva o significa que se le haya trasferido a esa persona el derecho patrimonial correspondiente.[15] Por lo tanto, argumenta que ninguna de las leyes pertinentes impide la aplicación de las disposiciones sobre bienes

---

[12] (Énfasis suprimido). Alegato en oposición a Petición de *Certiorari*, pág. 35.

[13] Id. pág. 42.

[14] Id. pág. 37.

[15] Id. pág. 39.

gananciales a los medios tangibles donde se plasmaron obras de arte.[16]

En resumen, la señora Acevedo Marrero sostiene que las obras físicas son gananciales por: 1) ser creadas durante la vigencia del matrimonio; (2) ser el producto del trabajo o industria del artista; (3) haberse utilizado bienes gananciales para crearlas; y (4) porque su adjudicación como bien ganancial no afectará los derechos patrimoniales y morales de los herederos.[17]

En conclusión, tanto la parte peticionaria como la parte recurrida aceptan que los derechos de explotación económica y los derechos morales corresponden al autor, y por consiguiente, a los herederos del artista. No obstante, disputan el derecho sobre la obra física creada durante el matrimonio.[18] Examinemos entonces las disposiciones de ley pertinentes a la controversia ante nos.

II

**A. Derechos de Autor**

En Puerto Rico los derechos de autor están fundamentalmente protegidos por la *Federal Copyright Act*[19]

---

[16] Id. pág. 42.

[17] No obstante, la señora Acevedo Marrero pretende que ampliemos nuestro análisis y concluyamos que los derechos patrimoniales sobre las obras del autor son también gananciales. Recordamos que la señora Acevedo Marrero no ha recurrido ante este Tribunal en revisión. *Cestero Aguilar v. Jta. Dir. Condomnio*, 184 DPR 1 (2011).

[18] Alegato de la parte peticionaria de 23 de julio de 2015, pág. 24.

[19] 17 USCA Sec. 101 *et seq.*

y por la *Ley de Propiedad Intelectual* de 1988 (aplicable al caso de autos y que fuera recientemente sustituida por la *Ley de Derechos Morales de Autor de Puerto Rico* de 2012).[20] *Harguindey Ferrer v. U.I.*, 148 DPR 13, 27 (1999); *Cotto Morales v. Ríos*, 140 DPR 604 (1996); *Pancorbo v. Wometco de P.R., Inc.*, 115 DPR 495 (1984); *Reynal v. Tribunal Superior*, 102 DPR 260 (1974). Además, de manera supletoria aplican las disposiciones del Código Civil que no sean incompatibles con estos estatutos. Artículo 12 del Código Civil, 31 LPRA Sec. 12. Véanse además, *S.L.G. Negrón-Nieves v. Vera Monroig*, 182 DPR 218, 224 (2011); *Harguindey Ferrer v. U.I.*, supra, pág. 27.

Como hemos expresado, la propiedad intelectual tiene rasgos muy singulares que la distinguen de otros géneros de bienes. *Ossorio Ruiz v. Srio. de la Vivienda*, supra. La hemos definido como "el conjunto de derechos que la ley reconoce al autor sobre las obras que ha producido con su inteligencia, en especial los que su paternidad le sea reconocida y respetada, así como que se le permita difundir la obra, autorizando o negando, en su caso, la reproducción". *Harguindey Ferrer v. U.I.*, 148 DPR 13, 21-22 (1999); *Cotto Morales v. Ríos*, supra, págs. 611-612, citando a Puig Brutau, Fundamentos del Derecho Civil, Tomo III, Barcelona, Bosch, 1973, págs. 200-201. Así, a

---

[20] Ley Núm. 96, *supra*, derogada por la Ley Núm. 55-2012, *supra*. Sobre un recuento histórico de las protecciones aplicables a la propiedad intelectual en Puerto Rico, véanse, *Ossorio Ruiz v. Srio. de la Vivienda*, 106 DPR 49 (1977) y *Reynal v. Tribunal Superior*, 102 DPR 260 (1974).

diferencia de otros tipos de propiedad, en ella coexisten valores económicos y valores espirituales, estos últimos intransmisibles y que facultan a su creador a mantenerla inédita y a renunciar a su autoría, entre otros derechos. C. Rogel Vide, *Estudios Completos de Propiedad Intelectual,* Madrid, Ed. Reus, 2003, págs. 55-56.

Los derechos sobre las obras se agrupan en dos (2) categorías o facetas: los derechos pecuniarios o patrimoniales -que consisten en el monopolio de la explotación económica de la obra- y los derechos personales o extrapatrimoniales -que protegen el vínculo personal entre el autor y su obra. Estos últimos dan pie a la doctrina del derecho moral. *Cotto Morales v. Ríos*, supra, 612; *Ossorio Ruiz v. Srio. de la Vivienda*, supra, pág. 52. Examinemos ambas facetas.

**Derechos Patrimoniales**:

En Puerto Rico, los derechos patrimoniales están principalmente protegidos por la legislación federal que en cuanto a su ámbito de aplicación ocupa el campo. *Harguindey Ferrer v. U.I.*, supra; *Cotto Morales v. Ríos*, supra, pág. 615; *Pancorbo v. Wometco de P.R., Inc.*, supra. Así, la ley gobierna los derechos exclusivos especificados en la Sección 106 con relación a obras pictóricas, gráficas y escultóricas, entre otras, que hayan sido fijadas en cualquier medio tangible de expresión. 17 USCA Secs. 102 y 106. Véanse, *Cotto Morales v. Ríos*, supra, pág. 614; *Pancorbo v. Wometco de P.R., Inc.*, supra, pág.

499. Estos derechos exclusivos sobre la obra incluyen reproducirla; preparar obras derivadas; distribuirla; representarla, y exponerla públicamente.[21] De igual forma, la ley los confiere inicialmente a su autor aunque pueden ser transferidos por este -en todo o en parte- por cualquier medio de transmisión o por operación de ley. Asimismo, reconoce bajo ciertos parámetros la terminación de dicha transferencia. 17 USCA Sec. 203. Por otro lado, también pueden ser cedidos por testamento o como propiedad personal por las leyes sucesorales estatales.[22] 17 USCA Secs. 201(a) y 201(d)(1).

---

[21] La Sección 106 de la *Federal Copyright Act*, 17 USCA sec. 106, provee lo siguiente:

"Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission." (Énfasis suplido).

[22] Traducción nuestra. Específicamente expresa la Sección 201(d)(1) del *Federal Copyright Act* en lo pertiente: "The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of interstate succession." 17 USCA Sec. 201(d)(1).

Sin embargo, no quedan desplazadas por la legislación federal aquellas acciones estatales que requieren elementos adicionales o distintos a los protegidos por la política federal y si los derechos que se intentan proteger tienen por fuente intereses locales de honda raíz, entre ellos el derecho moral.[23] *Cotto Morales v. Ríos*, supra, pág. 615.

**Derechos morales**:

Por otro lado, los derechos morales están fundamentalmente protegidos por la legislación estatal. Esta reconoce los derechos de los autores como exclusivos de estos y los protege no solo en beneficio propio sino también de la sociedad por la contribución social y cultural que históricamente se le ha reconocido a la propiedad intelectual.[24] Es por ello que la ley se fundamenta en facilitar la relación del artista con su obra y en crear un fino balance en cuanto al control de la misma. Así, "[e]l autor… tiene el derecho de beneficiarse de ella y las prerrogativas exclusivas de atribuirse o retractar su autoría, disponer de su obra, autorizar su publicación y proteger su integridad, con arreglo a las leyes especiales vigentes sobre la materia". 31 LPRA sec. 1401.

---

[23] Ya hemos indicado que algunas de las acciones estatales que no están afectadas por la *Federal Copyright Act* son las fundadas en la violación de un contrato o de una relación fiduciaria, la invasión de la intimidad, la difamación, las prácticas comerciales engañosas y las violaciones al derecho moral de autor, entre otras. *Harguindey Ferrer v. U.I.*, 148 DPR 13, 32 (1999); *Pancorbo v. Wometco de P.R., Inc.*, 115 DPR 495, 500 (1984).

[24] Véase nota al calce núm. 1.

Los derechos morales se derivan del nexo existente entre el autor y su creación. Esto independiente del valor puramente monetario que la obra pueda tener. 31 LPRA sec. 1401b. *Harguindey Ferrer v. U.I.*, supra, pág. 28. De esta forma se trata a la obra como una extensión de la personalidad del creador y los derechos sobre ella se consideran exclusivos de su autor. Exposición de Motivos, Ley Núm. 55-2012, *supra*. Véase además, *Ossorio Ruiz v. Srio. de la Vivienda*, supra, pág. 55; *Pancorbo v. Wometco de P.R., Inc.*, supra, pág. 501. Así, en el derecho civil tradicionalmente se ha clasificado el derecho moral de autor como un derecho personalísimo, junto a otros derechos tales como el derecho a la vida, a la libertad e integridad física, derecho al honor, a la imagen y otros. *S.L.G. Negrón-Nieves v. Vera Monroig*, supra, pág. 226, citando a *Cotto Morales v. Ríos*, supra, pág. 623.

Los derechos morales nacen con la obra misma, es decir, surgen al momento en que el autor fija su expresión en un medio tangible, e incluyen principalmente los derechos de integridad, atribución, retractación, publicación y acceso.[25] 31 LPRA sec. 1401. *S.L.G. Negrón-Nieves v. Vera Monroig*, supra, pág. 224; *Harguindey Ferrer v. U.I.*, supra, pág. 22; *Cotto Morales v. Ríos*, supra, pág. 622. *Ossorio Ruiz v. Srio. de la Vivienda*, supra, pág. 55. De igual forma, el autor los mantiene aun después de la cesión de la obra. *Id.* No obstante, solamente "[e]n

---

[25] Véase además, 31 LPRA sec. 1401j.

caso de muerte o incapacidad del titular, la protección del derecho recaerá en sus derechohabientes" por el periodo de tiempo dispuesto en ley.[26] 31 LPRA sec. 1401c.

Cabe señalar que "en 1990 el Congreso aprobó la Visual Artists Rights Act ("VARA") para incorporar – aunque de forma muy limitada – entre los derechos de autor reconocidos en la jurisdicción federal, los derechos morales de atribución e integridad sobre ciertas obras de artes visuales. Pub. L. No. 101-650, 104 Stat. 5128 (1990); 17 USCA sec. 106A". *S.L.G. Negrón-Nieves v. Vera Monroig*, supra, pág. 233. No obstante, a diferencia de nuestra ley y con relación a las obras creadas tras su promulgación, los derechos protegidos por VARA solamente son reconocidos durante la vida del autor. 17 USCA Sec. 106A(d).

De lo anterior se desprende que ambas facetas de la propiedad intelectual – la patrimonial y la moral – protegen derechos y facultades distintos. Reconociendo

---

[26] Con relación a la vigente Ley Núm. 55-2012, supra, el Artículo 6 especifica lo siguiente:

> "Al fallecimiento del autor, el ejercicio de los derechos morales corresponderá a la persona que el autor haya señalado expresamente por escrito. En su defecto, el ejercicio de estos derechos corresponderá a los herederos del autor.
> El derecho de retracto sólo podrá ejercerse después de su muerte si el propio autor ha manifestado expresamente por escrito que así se haga.
> Los derechos morales no podrán ejercerse en relación a obras que hayan entrado al dominio público". 31 LPRA sec. 1401n.

Sobre el reconocimiento de los derechos morales después de la muerte del autor en la Ley Núm. 55-2012, *supra*, véase, 31 LPRA sec. 1401m. Asimismo, la Ley Núm. 55-2012, *supra*, reconoce que los derechos morales no son renunciables, pero autoriza la renuncia en todo o en parte al derecho de integridad por el autor o su derechohabiente cuando conste en documento escrito y firmado.

que su carácter singular, complicado y polifacético ha provocado en ocasiones interpretaciones extremas, hemos favorecido la armonización de los intereses en conflicto en vez de sujetarla al típico derecho de bienes o concentrarnos en el elemento extrapatrimonial en detrimento de otros intereses individuales y sociales. *Ossorio Ruiz v. Srio. de la Vivienda*, supra, pág. 56.

Por otro lado, se desprende que ambas facetas requieren para su configuración que la obra conste en un medio tangible de expresión (ya sea la tabla, el lienzo, etc.), es decir, en un objeto que permita el disfrute y apreciación de la expresión personalísima del autor. Asimismo, las leyes que las rigen regulan y limitan su transmisión a una persona distinta del autor.

Dado que la controversia ante nos requiere estudiar la posible atribución de la titularidad de obras de arte a la Sociedad Legal de Gananciales, repasemos las disposiciones principales que rigen ese régimen matrimonial y los bienes o derechos a considerarse propios o comunes.

**B. Sociedad de Bienes Gananciales**

La Sociedad Legal de Gananciales es el régimen económico supletorio que rige durante el matrimonio a falta de capitulaciones matrimoniales válidas. Art. 1267 del Código Civil, 31 LPRA sec. 3551. Véase además, R. Serrano Geyls, *Derecho de Familia de Puerto Rico y Legislación Comparada*, San Juan, Ed. Programa de Educación Jurídica Continua

Universidad Interamericana de Puerto Rico, 1997, Vol. 1, pág. 321. Esta presenta características singulares y que contrastan con otras empresas y sociedades ya que conlleva efectos personales y patrimoniales que son regulados y estructurados por ley. *García v. Montero Saldaña*, 107 DPR 319 (1978).

La Sociedad Legal de Gananciales comienza el día en que se celebra el matrimonio y conlleva que **los cónyuges sean codueños y coadministradores de la totalidad del patrimonio matrimonial**, es decir, ostentan la titularidad conjunta de éste sin distinción de cuotas. *Montalvo v. Rodríguez*, 161 DPR 411, 420 (2014). Por otro lado, la Sociedad Legal de Gananciales concluye al disolverse, ya sea por muerte, divorcio o nulidad. Es desde ese momento en que ambos hacen suyos por la mitad las ganancias o beneficios obtenidos indistintamente por cualquiera de ellos durante el matrimonio. 31 LPRA Secs. 3621, 3681 y 3712.

El patrimonio matrimonial está compuesto por (1) los bienes adquiridos a título oneroso a costa del caudal común, (2) por aquellos **obtenidos por la industria, sueldo o trabajo de los cónyuges**[27] y (3) **por los frutos, rentas o intereses percibidos o devengados durante el matrimonio de los bienes comunes o privativos**. Artículo 1301 del Código Civil, 31 LPRA Sec. 3641. Asimismo, durante la vigencia de

---

[27] Con relación a los términos "industria" y "trabajo", véanse, *López v. González*, 163 DPR 275 (2004); *Pujol v. Gordon*, 160 DPR 505 (2003); *García v. Montero Saldaña*, 107 DPR 319 (1978).

esta Sociedad, existe una presunción rebatible de ganancialidad sobre todos los bienes del matrimonio. 31 LPRA Sec. 3647. Véanse, *Muñiz Noriega v. Muñoz Bonet*, 177 DPR 967 (2010); *García v. Montero Saldaña*, supra. Así, el cónyuge que reclama que un bien le pertenece privativamente tiene que destruir esa presunción. *Pujol v. Gordon*, 160 DPR 505, 513 (2003); *Echevarría v. Sucn. Pérez*, 123 DPR 664 (1989).

Sin embargo, nuestro régimen de gananciales **reconoce como axioma principal, el patrimonio individual de los cónyuges separado del de la Sociedad**. *Pujol v. Gordon*, 160 DPR 505, 512 (2003); *García v. Montero Saldaña*, 107 DPR 319 (1978). De esta forma, el Artículo 1299 del Código Civil, 31 LPRA sec. 3631, establece qué bienes se consideran propios de cada cónyuge.[28] Por otro lado, además del listado que provee esa disposición, también hemos reconocido que "hay bienes que por su naturaleza personalísima son exclusivos de su titular, aunque para su consecución se hayan destinado fondos del caudal común o empleado la industria, sueldo o trabajo de uno o ambos cónyuges. Estos están tan inextricablemente atados a las cualidades inmanentes a la persona, que no podrían ser calificados propiamente como 'gananciales'". *Díaz v.*

---

[28] "Son bienes propios de cada uno de los cónyuges:
   (1) Los que aporte al matrimonio como de su pertenencia.
   (2) Los que adquiera durante él, por título lucrativo sea por donación, legado o herencia.
   (3) Los adquiridos por derecho de retracto o por permuta con otros bienes, pertenecientes a uno solo de los cónyuges.
  **(4)** Los comprados con dinero exclusivo de la mujer o del marido". Artículo 1299 del Código Civil, 31 LPRA sec. 3631.

*Alcalá*, 140 DPR 959, 968-969 (1996). Esto ocurre, por ejemplo, con los grados académicos y las pensiones de retiro. *Id.*; *Maldonado v. Tribunal Superior*, 100 DPR 370 (1972). A esta conclusión hemos llegado porque aunque no haya en nuestro ordenamiento una expresión categórica de que como bien personalísimo un bien sea privativo, concluir lo contrario desvirtuaría sus finalidades y naturaleza personalísima. *Díaz v. Alcalá*, supra, págs. 968-970; *Maldonado v. Tribunal Superior*, supra, pág. 375. Véase además, J.J. Rams Albesa*, La Sociedad de Gananciales*, Madrid, Ed. Tecnos, 1992, págs. 75-77.

Por último, una vez celebrado el matrimonio, se prohíben expresamente las donaciones entre cónyuges, pues nuestra ley solo permite los regalos módicos que los cónyuges se hagan en ocasiones de regocijo para la familia. Artículos 1286 y 1287 del Código Civil, 31 LPRA secs. 3588 y 3589. Véase, R. Serrano Geyls, op. cit., pág. 317.

**C. Derechos de autor y Sociedad Legal de Gananciales**

El derecho antes expuesto pone en relieve la tensión que existe entre los intereses del autor y de la Sociedad Legal de Gananciales. Examinemos entonces detenidamente el alcance y la relación de la propiedad intelectual y el régimen matrimonial supletorio que provee nuestro ordenamiento. Cabe señalar que su tratamiento por tratadistas y tribunales ha sido limitado tanto en Puerto

Rico como en otras jurisdicciones.[29]  Este análisis se complica al considerar el tipo de obra bajo estudio, en particular las obras de arte plástico.  Esto pues, en ellas la expresión del genio del artista se materializa sobre un bien mueble ordinario representativo de un valor pecuniario.[30]  Por otro lado, recalcamos que cuando los derechos de propiedad intelectual deben reconciliarse con otros intereses, cada caso deberá examinarse a la luz de sus propios hechos. *Ossorio Ruiz v. Srio. de la Vivienda*, supra, pág. 56.

A tenor con lo que ya expresáramos, no existe controversia ni debate en la doctrina de que el derecho moral de autor es personalísimo y privativo. Este solo puede transferirse por la vía sucesoria, 31 LPRA Sec. 1401c, y por lo tanto, no es susceptible de formar parte de la masa común. *A contrario sensu*, la controversia gira en torno a si en Puerto Rico la obra física original es privativa del cónyuge autor o no y en qué extensión.

Así, en Puerto Rico el tema lo han abordado brevemente los profesores Eduardo Vázquez Bote y Migdalia

---

[29] J. Wesley Cochran, *It Takes Two to Tango!: Problems with Community Property Ownership of Copyrights and Patents in Texas*, 58 Baylor L. Rev. 407, 409 (2006).

[30] D. Espín Cánovas, *Derechos de un excónyuge sobre la propiedad intelectual del otro adquirida durante el matrimonio*, 39 Rev. Jurídica U. Inter. P.R. 87, 94 (Agosto-Diciembre 2004); C. Rogel Vide, *Estudios Completos de Propiedad Intelectual,* Madrid, Ed. Reus, 2003, pág. 22; Lucas, A. et Lucas, H.J., *Traité de la propriété littérarire & artistique*, citado en I.G. *Domínguez, Derechos de autor y régimen económico matrimonial en el derecho francés.* Derecho y opinión 6 (1998), pág. 253; J.J. Rams Albesa, *La sociedad de gananciales*, Madrid, Ed. Tecnos, 1992, pág. 89.

Fraticelli Torres.[31] Comenta el profesor Vázquez Bote (en referencia al Artículo 1 de la Ley de Propiedad Intelectual de 1988) que:

> el derecho exclusivo de "beneficiarse y disponer" de la obra no facilita estimar dicha propiedad como ganancial, salvo expresa atribución del titular. Pero, sin perjuicio del beneficio exclusivo del dominio, es indudable, que los frutos de dicha propiedad encajan en la hipótesis del art. 1.301, 2. Y 3., C.c. Por lo que parece sensato **distinguir el derecho exclusivo del autor, bien privativo, y los frutos, bienes gananciales**. (Énfasis suplido). E. Vázquez Bote, *Derecho privado puertorriqueño, derecho de familia*, San Juan, Ed. Equity, 1991, T. XI, pág. 180. Véase además, R. Serrano Geyls, op. cit., pág. 364.

Por otro lado, la profesora Fraticelli Torres reconoce el carácter personalísimo del derecho moral del cónyuge autor sobre su expresión artística. Empero, sostiene el carácter ganancial de su equivalente económico por ser el resultado del esfuerzo intelectual de este. Por lo tanto, invita a examinar diversos criterios para determinar la atribución ganancial de la obra artística o intelectual. M. Fraticelli Torres, *Un nuevo acercamiento a los regímenes económicos en el matrimonio: La sociedad legal de gananciales en el derecho puertorriqueño*, 39 Rev. Jur. U. Inter. P.R. 113 (2004).

Las diferencias en los análisis de ambos profesores es una situación constante en el estudio de esta controversia por juristas. Por ello, ante lo novel de

---

[31] También el Prof. Pedro G. Salazar opina al respecto, particularmente en casos de divorcio y con relación al derecho federal aplicable. P.G. Salazar, *La protección legal del autor puertorriqueño,* San Juan, Interjuris, 2013, pág. 119.

esta, y reconociendo la importancia que otros ordenamientos han tenido en el desarrollo del derecho de la propiedad intelectual, examinemos el análisis que se ha llevado a cabo en otras jurisdicciones. Tal como hemos expresado, el derecho comparado "no sólo nos ayuda a entender mejor el derecho como creación cultural, sino que proporciona una base intelectual para la interpretación y el análisis de los distintos sistemas jurídicos, lo que en definitiva ayuda también a entender e interpretar el sistema propio". *Ramírez Sainz v. S.L.G. Cabanillas*, 177 DPR 1, 10-11 (2009), citando a P. Lerner, *Sobre armonización, derecho comparado y la relación entre ambos*, XXXVII (Núm. 11) Boletín Mexicano de Derecho Comparado 919 (2004). Sin embargo, antes de emprender esta tarea, enfatizamos que cada jurisdicción estudiada ha abordado la controversia según esta encuadra en las particularidades de su ordenamiento jurídico y sus respectivos regímenes matrimoniales, los cuales en ocasiones varían sustancialmente del nuestro. Por lo tanto, aunque el derecho comparado puede nutrir nuestro análisis, su uso en esta controversia debe hacerse con cuidado y con ponderación.

Como comentáramos en *Reynal v. Tribunal Superior*, supra, la Ley de Propiedad Intelectual Española de 1879 protegía los derechos de autores en Puerto Rico.[32]

---

[32] Las disposiciones concernientes a la propiedad intelectual en España han sido posteriormente enmendadas, principalmente en 1987, 1996 y tan reciente como el 2014. No obstante, las disposiciones pertinentes a

Asimismo, en dicho estatuto se basó nuestra Ley de

Propiedad Intelectual de 1988, supra.[33]

Examinemos pues, como se ha desarrollado esta

controversia en España. Al respecto, Carlos Rogel Vide nos

ofrece el recuento histórico siguiente:

> En España carecemos de jurisprudencia sobre el particular y la doctrina, aun contando con artículos sobre el tema similares a los franceses, ha sido, hasta 1981, extraordinariamente parca, moviéndose exclusivamente en torno al antiguo artículo 1.401 de nuestro Código Civil.[34]
>
> …
>
> Los pocos autores españoles que –parcamente- se han ocupado de la misma hasta 1981, consideran la cuestión desde el prisma del antiguo artículo 1.401.2.° del Código civil exclusivamente. Dicho artículo, prácticamente idéntico al actual 1.347.1° del mismo cuerpo legal, reza así: "Son bienes gananciales… 2.° los obtenidos por la industria, sueldo o trabajo de los cónyuges o de cualquiera de ellos.
>
> En una primera época, y sobre esta pauta, se consideraban gananciales -con más o menos dudas sobre la bondad o justicia de tal solución- ya la propiedad intelectual en bloque, ya las obras del espíritu, ya los productos, las retribuciones obtenidas de las mismas, **sin referencia expresa aquí al derecho moral de los autores ni distingo alguno ulterior.** En esta línea se mueven Manresa, Mucius y Royo Martínez.
>
> En una segunda etapa –a partir de 1960, más o menos-, los autores empiezan a distinguir, ya, entre derechos morales, derechos de explotación y productos o beneficios resultantes del ejercicio de estos últimos, entendiendo que, salvo el derecho moral del autor, todo lo demás es

---

su relación con los regímenes matrimoniales están contenidas principalmente en el Código civil español.

[33] Exposición de Motivos, Ley Núm. 55-2012.

[34] El Artículo 1.401 corresponde al actual Artículo 1.347.1 del Código Civil español y al Artículo 1301 del Código Civil de Puerto Rico, 31 LPRA sec. 3641.

ganancial.  En dicha línea se mueve Puig Peña, a quien cita Reyes Monterreal, y Puig Brutau, que cita a los dos anteriores.

Ésta es la opinión mayoritaria -y equivocada, para Lacruz- hasta la reforma del Código civil de 1981. (Énfasis suplido). (Notas al pie de página omitidas). Rogel Vide, *op. cit.* págs. 25-29.

Por su parte, Lacruz Berdejo sostenía desde antes de la Reforma de 1981 que "el derecho de propiedad intelectual no puede ser considerado como un simple valor pecuniario, habiendo de tenerse en cuenta, al contrario, los estrechos vínculos que lo atan a la personalidad de su autor".[35] Así, sostiene que "cabe pensar que el derecho patrimonial de autor solo se hace común en el momento en que se traduce, para su titular, en consecuencias pecuniarias, y sólo en cuanto a estas consecuencias…". J.L. Lacruz Berdejo y F. Sancho Rebullida, *Derecho de Familia I*, Bosch, Barcelona, 1978, pág. 236. La postura de Lacruz Berdejo fue céntrica para la reforma del Código civil español de 1981 en materia de régimen económico matrimonial y que incluyó el inciso 5 al Artículo 1.346. Con esta enmienda al Código Civil se aclaró que son bienes privativos "los bienes y derechos patrimoniales inherentes a la persona y los no transmisibles inter vivos".  A la luz de estos cambios, hoy día la doctrina española predominante puede resumirse de la forma siguiente: que el derecho moral de autor es un derecho personalísimo que no

---

[35] Rams Albesa, *op. cit.*, pág. 75. Lacruz Berdejo excluía de la masa ganancial derechos con claro valor patrimonial pero con interés moral.

forma parte de la masa común y solo se transmite por vía sucesoria;[36] que son privativos del cónyuge autor los derechos o facultades patrimoniales que integran la propiedad intelectual;[37] pero que los frutos e ingresos de la explotación regular de la propiedad intelectual son gananciales.[38]

Entre los juristas españoles que han abordado el tema en décadas recientes, Carlos Rogel Vide sostiene la privatividad de la obra. Reconoce la singularidad de que la obra de arte sea plasmada de forma indisociable y necesaria en un soporte material único e irrepetible, pero sustenta su privatividad en los Artículos 375 y 377 del Código Civil español[39] y en que "lo definitivo no es el soporte material, sino la obra de arte contenida en el

---

[36] Rams Albesa, *op. cit.*, págs. 82-83.

[37] C. Rogel Vide, *Estudios Completos de Propiedad Intelectual,* Madrid, Ed. Reus, 2003, pág. 29. Carlos Rogel Vide hace un excelente resumen de los pronunciamientos hechos por autores españoles tras la reforma de 1981. Id., págs. 34-46.

[38] Rams Albesa, *op. cit.*, pág. 87.

[39] Los Artículos 375 y 377 del Código Civil español corresponden a los Artículos 310 y 312 del Código Civil de Puerto Rico, 31 LPRA Secs. 1191 y 1193. El Artículo 310 del Código civil establece que:
    "Cuando dos cosas muebles pertenecientes a distintos dueños se unen de tal manera que vienen a formar una sola sin que intervenga mala fe, el propietario de la principal adquiere la accesoria, indemnizando su valor al anterior dueño".

Por otro lado, el Artículo 312 del Código civil indica:
    "Si no puede determinarse por la regla de la sección anterior cuál de las dos cosas incorporadas es la principal, se reputará tal el objeto de más valor, y entre dos de igual valor, el de mayor volumen. **En la pintura y escultura, en los escritos, impresos, grabados y litografías, se considerará accesoria la tabla, el metal, la piedra, el lienzo, el papel o el pergamino"**. (Énfasis suplido).

mismo, cuya propiedad […] corresponde al autor por el solo hecho de su creación…". Rogel Vide, *op. cit.*, pág. 65.

Por su parte, sostiene Diego Espín Cánovas que la dependencia y conexión de las facultades patrimoniales y personales del autor sobre la obra "imposibilitan su adquisición por la sociedad de gananciales,[40] pues en sí mismas dichas facultades no constituyen un bien adquirido por la industria del cónyuge-autor que pudiera entrar en la sociedad a tenor del Art. 1347-1 [correspondiente a nuestro Artículo 1301(2)]. Solamente los beneficios de la explotación de la propiedad es lo que adquiere la comunidad conyugal, conforme al Art. 1347 núm. 2 CC [correspondiente a nuestro Artículo 1301(3)]".[41] D. Espín Cánovas, *Derechos de un ex cónyuge sobre la propiedad intelectual del otro adquirida durante el matrimonio*, 39 Rev. Jurídica U. Inter. P.R. 87, 94 y 96 (Agosto-Diciembre 2004). Así, pues, "[e]sta caracterización de las obras de arte no explotadas por el autor impedirá su atribución a la sociedad de gananciales y subsiguiente masa a dividir entre cónyuges en caso de fallecimiento del pintor, escultor, etc. Pertenecerán a su propio haber". Id, pág. 96. Igual postura presentan Joaquin J. Rams Albesa,[42] y Manuel Peña y Bernaldo de Quiros.[43]

---

[40] D. Espín Cánovas, *supra*, pág. 94.

[41] *Id.*, pág. 93.

[42] Rams Albesa, *op. cit.*, pág. 73. ("[D]eben quedar fuera de la masa ganancial aquellos bienes y derechos que, sirviendo fundamentalmente a la personalidad humana y a su íntimo desarrollo, se avienen mal con la

Por otro lado, Francia ha sido una jurisdicción de grandes aportaciones en este tema por lo que provee un marco importante para el análisis del mismo. Así, en un principio la tendencia francesa -que estuviera marcada por su jurisprudencia- consideraba que las obras, los frutos y el monopolio de su explotación eran gananciales. Por otro lado, se reservaba el derecho moral como privativo. La ganancialidad de la propiedad intelectual se sostuvo en esta jurisdicción, entre otras razones, porque Francia tenía una configuración de la comunidad legal supletoria distinta a la nuestra y que fue modificada tan reciente como durante las reformas del Derecho de familia francés de 1965 y 1985.[44] Asimismo, divergencias doctrinales admitían diferenciar según la forma de disolución de la

---

gestión y el ejercicio consorciado de la disposición propios del sistema").

[43] Manuel Peña y Bernaldo de Quirós, *De la Propiedad Intelectual*, en M. Albaladejo, *Comentarios al Código Civil y Compilaciones Forales,* Madrid, Ed. Rev. Der. Privado, 1985, T. V, Vol. 2, pág. 767. ( "El carácter personalísimo del bien explotado exige que la obra intelectual creada durante la vigencia de la sociedad de gananciales deba ser considerada en principio, como bien privativo, en cuanto se trata de un derecho patrimonial inherente a la persona (cfr. Artículos 1.346, 5, del Código civil y 39,4, de la Compilación de Aragón y Real Orden de 9 octubre 1912), y, en cambio, los rendimientos (incluso por enajenación) que durante la vigencia de la sociedad se obtengan deben ser considerados como bienes gananciales".)

[44] La comunidad legal francesa hasta 1965 era la de muebles y adquisiciones. Este antiguo régimen comunitario francés incluía en la masa común todos los bienes muebles sin distinguir cuándo y bajo qué título fueron adquiridos por los cónyuges. Asimismo, sólo podían considerarse privativos los objetos o derechos considerados inmuebles por naturaleza o por la ley. Rams Almesa, *op. cit.,* págs. 71 y 78. No obstante, con posterioridad la ley reconoció la privatividad de bienes que tengan un carácter personal o derechos exclusivamente ligados a la persona. Id., pág. 72. Hoy día la comunidad legal francesa es la de adquisiciones. Esta comunidad es muy similar a la sociedad de gananciales española. Rogel Vide, *op. cit.*, pág. 24.

comunidad legal francesa.[45]  No obstante, esto cambió tras

la promulgación de la Ley No. 57-298 de 11 de marzo de

1957 cuando se reconocieron en Francia como derechos

privativos del autor tanto el monopolio de explotación[46]

como los derechos de reproducción; conservando los frutos

recibidos durante la vigencia de la comunidad su carácter

ganancial.[47] D. Espín Cánovas, *supra,* pág. 94.

Así, el Artículo 25 de la Ley francesa de Propiedad

Literaria y Artística de 11 de marzo de 1957 dispuso que:[48]

> Para todos los regímenes matrimoniales y bajo
> pena de nulidad para todas las cláusulas
> contrarias introducidas en el contrato de
> matrimonio, el derecho de divulgar, el de fijar
> las condiciones de explotación y el de defender
> su integridad, quedan propios del cónyuge autor o

---

[45] Antes de la Reforma de 1965, la doctrina francesa admitía una "doble disciplina jurídica a definir en el momento de la disolución de la comunidad, de forma tal que si ésta se debía a la muerte de uno de los cónyuges, los derechos y bienes a que nos venimos refiriendo [derechos de autor]  se computarían como parte integrante de la masa común; en tanto que contrariamente, si la disolución trae causa de la separación o divorcio, se entendían estos bienes y derechos inherentes a la persona como entera y permanentemente privativos". Rams Albesa, *op. cit.*, pág. 77.

[46] Sobre las incoherencias de la inclusión plena del monopolio de explotación en la comunidad con relación a la propiedad literaria y musical a pesar de que este pueda ser transmitido *inter vivos*, véase, Rams Albesa, *op. cit.*, pág. 86.

[47] El Tribunal de Apelaciones indicó en su Sentencia que "tan reciente como el 12 de mayo de 2011, la Corte de Casación reiteró la normativa de que las pinturas, por ser bienes tangibles, deben incluirse en el caudal ganancial". Ciertamente la Corte de Casación concluyó que los bienes muebles de ambos (incluso los adquiridos por herencia como fuera el caso bajo examen) eran parte de la comunidad.  No obstante, esta determinación surge de un contexto particular, pues los cónyuges se habían casado en 1955 bajo el régimen de muebles y adquisiciones previo a la reforma del Código civil francés. (Arrêt n° 451 du 12 mai 2011 (10-15.667) – Cour de cassation – Première chambre civile, disponible en https://www.courdecassation.fr/jurisprudence_2/premiere_chambre_civile_568/451_12_22375.html).  Véase nota al calce núm. 44 con relación al régimen de muebles y adquisiciones francés.

[48] El Artículo 25 de la Ley francesa de Propiedad Literaria y Artística de 11 de marzo de 1957 corresponde, salvo algunas modificaciones, al actual Artículo L-121-9 del Código de Propiedad Intelectual francés de 1992.

de aquel de los esposos al que tales derechos le hayan sido transmitidos.

Este derecho no puede ser aportado en dote, ni adquirido por la comunidad o por una sociedad de ganancias.

Los productos pecuniarios provenientes de la explotación de una obra intelectual o de la cesión total o parcial del derecho de explotación están sometidos a las reglas aplicables a los muebles, siguiendo el régimen matrimonial adoptado únicamente cuando éstos han sido adquiridos durante el matrimonio. Traducción en Rams Albesa, *op. cit.*, pág. 85.

Con este artículo se reconocieron entonces las dificultades teóricas y prácticas que se suscitan al determinar la gananciadad de la propiedad intelectual y los bienes sujetos a esta. Esto pues, el autor tiene unas prerrogativas – tales como decidir cuándo divulgar su obra, retractarse, entre otras – que inciden en el monopolio de su explotación económica. I.G. *Domínguez, Derechos de autor y régimen económico matrimonial en el derecho francés.* Derecho y opinión 6 (1998), pág. 248.

Por lo tanto, podemos observar (tanto de la experiencia francesa como de la española) un movimiento por parte de la doctrina hacia el reconocimiento de la privatividad de este tipo de propiedad y especialmente cuando la obra no ha estado sujeta a explotación.

Por último, el tratamiento por tratadistas y tribunales en Estados Unidos también ha sido limitado. Así, los tribunales han examinado en contadas ocasiones controversias sobre la imbricación entre el derecho de propiedad intelectual con disposiciones estatales de

propiedad marital.  Más limitada aún ha sido su discusión en jurisdicciones donde rige la comunidad como régimen matrimonial y en ninguno de estos casos se ha examinado el efecto que los derechos morales de autor pueden tener sobre la controversia. Esto puede deberse en parte a que en Estados Unidos solo ocho (8) estados reconocen expresamente la propiedad en comunidad en el matrimonio.[49] De igual forma, solo once (11) estados tienen leyes que protegen en alguna medida los derechos morales de autor.[50] Así, el análisis por tratadistas y tribunales se ha limitado a la participación del cónyuge no autor en los derechos patrimoniales de la propiedad intelectual, asunto que no está ante nuestra consideración.[51]

---

[49] Los ocho (8) estados que reconocen la propiedad en comunidad son: Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas y Washington. M.B. Nimmer y D. Nimmer, *Nimmer on Copyright*, Matthew Bender, Vol. 1, Sec. 6A-2.

Sobre las implicaciones de la cotitularidad de la propiedad intelectual en jurisdicciones de separación de bienes, véase, F.M. Nevins, *When an Author's Marriage Dies: The Copyright-Divorce Connection*, 37 J. Copyright Soc'y U.S.A. 382, 388 1989-1990.

[50] Los once (11) estados son California, Connecticut, Louisiana, Maine, Massachusetts, Nevada, New Jersey, New Mexico, New York, Pennsylvania, and Rhode Island. B.A. Lee, *Making Sense of "Moral Rights" in Intellectual Property*, 84 Temp. L. Rev. 71 (Fall 2011).

[51] *In re Marriage of Worth*, 195 Ca. App. 3d 768 (1987). Véase en oposición, F.M. Nevins, *To Split or Not to Split: Judicial Divisibility of the Copyright Interests of Authors and Others*, 40 Fam. L.Q. 499 2006-2007; L.J. Gibbons, *Then, You Had It, Now, It's Gone: Interspousal or Community Property Transfer and Termination of an Illusory Ephemeral State Law Right or Interest in a Copyright*, 24 Fordham Intell. Prop. Media & Ent.L.J. 97 (2013); Nevins, *When an Author's Marriage Dies,* supra, pág. 394.

Véase además, *Rodrigue v. Rodrigue*, 218 F.3d 432 (2000), Véanse, además, *Berry v. Berry*, 127 Hawai'i 243 (2012); *Teller v. Teller*, 99 Hawai'i 101 (2002). En contra, J. W. Cochran, *It Takes Two to Tango!: Problems with Community Property Ownership of Copyrights and Patents in Texas*, 58 Baylor L. Rev. 407 2006; D.S. Ciolino, *Why Copyrights are not Community Property*, 60 La. L. Rev. 127 (1999-2000).

Con todo esto en mente, pasemos a examinar la controversia ante nos.

## III

En primer lugar, nuestra interpretación de las leyes debe asegurar el resultado que originalmente se quiso obtener. Por ello, acudimos primero al texto de la ley, pues un lenguaje claro e inequívoco es la expresión por excelencia de la intención legislativa. Artículo 14 del Código Civil, 31 LPRA Sec. 14. Véase además, *Cruz Parrilla v. Depto. Vivienda*, 184 DPR 393 (2012). No obstante, cuando las leyes aplicables no atienden expresamente la controversia, debemos considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobar una ley y el propósito social que la inspiró con el objetivo de armonizar, hasta donde sea posible, todas las disposiciones de ley aplicables a un caso y lograr un "'resultado sensato, lógico y razonable' que represente y salvaguarde la efectividad de la intención legislativa". *Muns. Aguada y Aguadilla v. JCA*, 190 DPR 122, 142 (2010). Para ello "[d]ebemos interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes secciones, supliendo las posibles deficiencias cuando esto fuera necesario". *Departamento de Hacienda v. Telefónica,* 164 DPR 195, 204 (2005).

En el caso de autos no existe controversia entre las partes de que tanto bajo la ley federal como la estatal el maestro Rosado Del Valle como autor de las obras tenía los

derechos que comprenden la "propiedad intelectual" sobre las mismas, y que tras su muerte, la protección de sus derechos recayó sobre los derechohabientes. Así, la controversia principal es estrictamente sobre el carácter ganancial o privativo de las obras físicas sujetas a tales derechos y que fueron creadas vigente el matrimonio entre 2001 al 2008.

En ausencia de disposición legal que reglamente la naturaleza privativa o ganancial de estas obras, estamos llamados a sopesar el derecho de propiedad intelectual y las disposiciones del régimen económico de la Sociedad Legal de Gananciales antes discutidos. Por un lado, reside en el autor de una obra, en este caso de arte plástico, el derecho exclusivo a beneficiarse y disponer de ella. 31 LPRA Sec. 1401. Asimismo, no hay duda del carácter personalísimo e inalienable del derecho moral del artista. Por otro lado, las obras, en tanto que son bienes, fueron creadas con el ingenio y esfuerzo del artista vigente la Sociedad Legal de Gananciales. Estos intereses de gran valor a primera vista pueden parecer incompatibles o excluyentes, pero es nuestra labor armonizarlos teniendo en mente los propósitos de la Asamblea Legislativa al aprobar las leyes bajo examen y el propósito social que las inspirara.

Así, el propósito de la Ley de Propiedad Intelectual de 1988, y que no variara con la promulgación de la Ley de Derechos Morales de Autor de 2012, *supra*, es proteger la

relación personalísima del autor con su obra y facilitar lo que este desee hacer con su creación, que incluye entre otras prerrogativas, las de publicar la obra o retractarse de la misma. Concluimos que este propósito es incompatible con permitir la cotitularidad y coadministración de las obras con la Sociedad Legal de Gananciales, persona no contemplada por las disposiciones aplicables para compartir estas facultades. Pesa también en nuestro ánimo que la Asamblea Legislativa reconoció su singularidad mediante ley especial, por lo que en atención al principio de especialidad esta ley prevalece sobre una de carácter general. Artículo 12 del Código Civil, 31 LPRA sec. 12.

Ciertamente nuestro ordenamiento jurídico distingue los derechos de autor del medio tangible de expresión como sostiene la parte recurrida, asimismo las obras en cuestión fueron creadas por el esfuerzo de su esposo vigente el matrimonio, pero esto no es suficiente para sostener la gananciaidad de una obra original de arte plástico que no ha sido explotada. Nuestro ordenamiento no solo hace la distinción que señala la señora Acevedo Marrero, sino que también diferencia la propiedad intelectual de otros tipos de propiedad y nos requiere subordinar el "objeto" al derecho de autor. Así, reconoce y limita cómo y cuándo puede ser transferido; lo protege de alteraciones, otorga al autor las facultades antes mencionadas, y reconoce el valor superior de la obra de

arte sobre la tabla, el lienzo, el metal o la piedra, es decir, el medio tangible de expresión. Artículo 312 del Código Civil, 31 LPRA Sec. 1193. Es por estos fundamentos que concluimos que al estar el autor en posesión de las obras y en condiciones de ejercer todos aquellos derechos que tanto la ley federal como estatal le confiere, estas son privativas.

De esta forma, a la disolución del matrimonio por razón de muerte del autor, las obras que no han sido vendidas ni cedidas, son parte del caudal hereditario y transmisibles de conformidad con el derecho de sucesión. Estas no han dejado el seno de su creador ni la protección que le brinda el derecho moral de autor, por lo que no se han convertido en bienes absorbibles por la masa ganancial.

No obstante, al ser el autor o la autora a quien nuestro ordenamiento jurídico le reconoce la paternidad o maternidad sobre su creación, así como los derechos de disponer de ella, divulgarla, retractarse, etc., se afecta de esta forma que sea automáticamente considerada un bien ganancial. Otra cosa es lo que voluntariamente decida hacer el autor con las obras no explotadas, siempre y cuando, esto le sea permitido bajo nuestro ordenamiento jurídico (e.g. derecho de sucesiones o el régimen matrimonial, entre otros).

Sin embargo, tan pronto dicha obra se traduce en beneficios económicos el cuadro de privatividad antes

descrito cede y por lo tanto, la Sociedad Legal de Gananciales tiene derecho a los frutos que esta genere vigente el matrimonio, así como aquellos derechos que le reconoce nuestro ordenamiento jurídico sobre los bienes privativos. De esta forma, se protegen y armonizan ambos intereses. Asimismo, reconocemos que la Sociedad tiene un crédito por los materiales, bienes o fondos comunes que se utilizaron para la creación de las obras y que fueron pagados por esta.[52]

## IV

Examinemos de forma conjunta el segundo y tercer señalamiento de error. Específicamente la parte peticionaria sostiene que el Tribunal de Apelaciones erró al determinar que el maestro Rosado del Valle le donó a la señora Acevedo Marrero catorce (14) obras antes de contraer matrimonio y otras cinco (5) obras ya vigente el mismo. Recapitulemos los hechos pertinentes.

La señora Acevedo Marrero reclama como suyas treinta y cinco (35) obras que argumenta le fueron regaladas con *anterioridad* al matrimonio. Asimismo, reclama cincuenta y seis (56) obras que indica le fueron regaladas por su esposo *durante* el matrimonio en ocasión de regocijo familiar, es decir, reclama una tercera (1/3) parte de las obras creadas por el maestro Rosado del Valle durante los siete (7) años que estuvieron casados.

---

[52] Artículo 1317 del Código Civil, 31 LPRA Sec. 3692. Véase, *Díaz v. Alcalá*, 140 DPR 959 (1996).

El Tribunal de Primera Instancia adjudicó a favor de la señora Acevedo Marrero nueve (9) obras que la parte peticionaria reconoció le fueron regaladas por el maestro Rosado del Valle. Asimismo, concluyó que otras doce (12) obras le pertenecían a la señora Acevedo Marrero por tratarse de donaciones verbales de bienes muebles en las que se cumplieron todos los requisitos de ley para su validez. Por último, determinó que solamente tres (3) obras fueron donaciones realizadas durante el matrimonio porque cumplían con la excepción de regalo módico en ocasión de regocijo familiar.[53] El Tribunal de Primera Instancia concluyó que las demás obras se trataban de donaciones realizadas durante el matrimonio que no cumplían con ninguna excepción, por lo que eran nulas. En particular, sostuvo que:

> En cuanto a[sic] valor módico de las obras, basta consignar que la propia demandada reconoció y exigió valores por miles de dólares para algunas de las obras que reclama como regalo. Su única prueba en relación con el factor de "modicidad" fue que el costo de los materiales de cada obra es un promedio de $15.00- $20.00. No podemos apoyar tal argumento, ya que la demandada no recibió pinceles, brochas, papel, acrílico, etc. como "regalo", sino la creación artística extraordinaria que el genio del maestro produjo al mezclar esos materiales. Es menester mencionar que la Sra. Sonia Acevedo requirió que el Museo de Arte de Puerto Rico asegurara las obras del Maestro que ella y los hijos de él prestaron para la exhibición "El Plan Pictórico de lo Concreto" en 2009, por las siguientes cantidades:

---

[53] El Tribunal de Primera Instancia reconoció "que las obras VV068, VV084 (regaladas en sus cumpleaños) y la VV097 (regalada en el mes del amor), le pertenecen a la señora Acevedo, ya que fueron regaladas en ocasión de regocijo y constituyen excepciones a las donaciones entre cónyuges". Apéndice de la Petición de *Certiorari*, pág. 488.

Autorretrato por $150,000.00; Girasol por $150,000.00; Sonia por $200,000.00; Flor espinosa por $100,000.00; Impedidos por $100,000.00; Perro por $100,000.00; Pichón por $100,000.00 y Jirafa I por $75,000.00. Añadimos que las serigrafías de la obra VV076, se vendían en $3,000.00. Apéndice de la Petición de *certiorari*, pág. 488.

Con relación a las obras restantes, el foro primario concluyó que no le pertenecían a esta por diversas razones, particularmente por (1) la credibilidad que le mereció el testimonio de la señora Acevedo Marrero; (2) porque no tenían la firma completa del maestro; (3) por no tener lenguaje suficiente para constituir una dedicatoria y no estar dirigida a la señora Acevedo Marrero; (4) por no quedar debidamente establecida la autenticidad de la autoría de las anotaciones o por tener más de una inscripción en ellas;(5) y por no cumplirse con algún requisito de donaciones muebles, particularmente el de entrega simultánea del objeto. Artículo 574 del Código Civil, 31 LPRA Sec. 2009.

Sin embargo, el Tribunal de Apelaciones concluyó que el foro primario incidió al no determinar que la señora Acevedo Marrero era dueña de las demás catorce (14) obras que esta también reclamara como regalos del artista antes del matrimonio, pues de su testimonio se podía concluir que estas le fueron obsequiadas por este y se encontraban en su poder antes de contraer matrimonio. Así, expresó que "el pormenorizado testimonio de Doña Sonia, unido al testimonio de su perito calígrafo, tuvo el efecto de activar la presunción de que "[t]oda cosa entregada por

una persona a otra pertenecía a esta".[54] Asimismo, concluyó que el testimonio del perito calígrafo confirmó y corroboró el testimonio de la señora Acevedo Marrero de que su esposo le regaló las obras.

Por otro lado, el foro apelativo intermedio concluyó que el foro primario actuó correctamente al limitar la excepción que permite la donación entre cónyuges de regalos módicos en ocasiones de regocijo familiar. Empero, sostuvo que otras cinco (5) obras también le fueron regaladas durante la vigencia del matrimonio tras el examen minucioso de la prueba, específicamente el testimonio de la señora Acevedo Marrero.

Es norma conocida que los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza el foro primario, a menos que se demuestre que el juzgador haya incurrido en error manifiesto, pasión, prejuicio o parcialidad.[55] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750 (2013). Esto pues, en nuestro ordenamiento judicial le damos deferencia al juzgador de hechos en cuanto a su apreciación de la prueba testifical porque al ser una tarea llena de elementos subjetivos, es quien está en mejor posición para

---

[54] En el caso de autos no hay controversia sobre que las obras en cuestión fueron creadas por el maestro Rosado del Valle.

[55] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750 (2013) ("[I]ncurre en "pasión, prejuicio o parcialidad" aquel juzgador que actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna.")

aquilatarla. Es el Tribunal de Primera Instancia el que tuvo la oportunidad de oír y ver el comportamiento de la testigo. Por ello, cuando la evidencia directa de un testigo le merece entero crédito a este, ello es prueba suficiente de cualquier hecho. *SLG Torres-Matundan v. Centro Patología*, 193 DPR __ (2015); 2015 TSPR 131; *Meléndez Vega v. El Vocero*, 189 DPR 123 (2013). De esa forma, la intervención con la evaluación de la prueba testifical procedería en casos en los que luego de un análisis integral de la prueba, nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia. *Rivera Menéndez v. Action Services*, 185 DPR 431, 444 (2012); *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009); *Flores v. Soc. de Gananciales*, 146 DPR 45, 49 (1998).

Por otro lado, con relación a la prueba pericial ningún tribunal está obligado a seguir indefectiblemente las conclusiones de un perito. Es más, "todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte ser técnicamente correcta". *Zambrana v. Hospital Santo Asilo de Damas,* 109 DPR 517, 522 (1980). Al respecto, cuando las conclusiones de hecho del foro de instancia estén basadas en prueba pericial o documental, el tribunal revisor se encuentra en

la misma posición que el foro recurrido. *González Hernández v. González Hernández*, 181 DPR 746(2011).

En el caso de autos el foro primario presenció durante un periodo de seis (6) días el testimonio de la señora Acevedo Marrero sobre cada una de las obras que reclamara y procedió a adjudicar credibilidad. Luego de este examen, al foro primario le mereció credibilidad el testimonio de la señora Acevedo Marrero con relación a algunas obras pero no para otras, y ordenadamente el tribunal detalló sus razones. Así, por ejemplo en el caso de una de las obras, se probó que "las anotaciones o inscripciones en [ella] se hicieron mucho después de la fecha en que la Sra. Sonia Acevedo declaró que el Maestro le regaló la obra".[56] Con relación al testimonio del perito calígrafo, sostuvo que aunque alguna de las obras que examinara tenían inscripciones y/o la firma del autor, y que un perito calígrafo identificó y reconoció la firma de este como auténtica, "[p]or las grandes diferencias que pudo apreciar este Tribunal en las inscripciones contenidas en las obras, así como la incompatibilidad notable entre las firmas del artista entre una y otra obra, el testimonio pericial presentado no nos merece credibilidad".[57] No obstante lo anterior, el Tribunal de Primera Instancia concluyó que "las inscripciones o anotaciones que determinamos auténticas, dirigidas a la

---

[56] Apéndice de la Petición de *Certiorari*, págs. 485-486.

[57] Id., pág. 476.

Sra. Sonia Acevedo y firmadas por el maestro constituyen, en el mejor de los casos, prueba de la intención de él de regalarle la pintura en cuestión, sujeto al cumplimiento con el requisito de entrega del objeto, simultánea con el regalo. Art. 574 del Código Civil, *supra*".[58] Por lo tanto, la prueba en el caso sobre las donaciones de las obras consistió esencialmente en el testimonio de la señora Acevedo Marrero.

La oportunidad de apreciar el testimonio vertido por los testigos no la tuvo el foro apelativo intermedio ni este Tribunal. Tampoco se desprende del expediente que el Tribunal de Primera Instancia incurriera en error manifiesto, pasión, prejuicio o parcialidad, para que el Tribunal de Apelaciones descartara las determinaciones de hecho de ese foro y en cambio le diera entera credibilidad al testimonio de la señora Acevedo Marrero. Por consiguiente, concluimos que erró el foro apelativo intermedio al no brindarle deferencia a las determinaciones de hecho del foro primario como hizo.

**V**

Por los fundamentos expresados, las obras del maestro Rosado del Valle que no estuvieran sujetas a un contrato de explotación económica o que no hayan sido cedidas al fallecimiento del autor, son privativas y parte del caudal hereditario. No obstante, la extinta sociedad legal de gananciales – y la señora Acevedo Marrero como partícipe

---

[58] Apéndice de la Petición de *Certiorari*, pág. 485.

de la comunidad postganancial - tiene un crédito por los materiales, bienes o fondos comunes que se utilizaron para la creación de las obras.

Por otro lado, sostenemos la apreciación de la prueba llevada a cabo por el foro primario. Conforme a lo anterior, revocamos la sentencia recurrida y devolvemos el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con esta opinión.

Se dictará Sentencia de conformidad.


                              Mildred G. Pabón Charneco
                                   Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Margarita Rosado Muñoz, David Rosado Núñez, Christopher Rosado Goldstone Como miembro de la Sucesión Julio Rosado del Valle<br><br>Peticionarios<br><br>v.<br><br>Sonia Acevedo Marrero<br><br>Recurrida | CC-2014-1003 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico a 23 de noviembre de 2016.

Por los fundamentos expresados, las obras del maestro Rosado del Valle que no estuvieran sujetas a un contrato de explotación económica o que no hayan sido cedidas al fallecimiento del autor, son privativas y parte del caudal hereditario. No obstante, la extinta sociedad legal de gananciales – y la señora Acevedo Marrero como partícipe de la comunidad postganancial - tiene un crédito por los materiales, bienes o fondos comunes que se utilizaron para la creación de las obras.

Por otro lado, sostenemos la apreciación de la prueba llevada a cabo por el foro primario. Conforme a lo anterior, revocamos la sentencia recurrida y devolvemos el caso al Tribunal de Primera Instancia para procedimientos ulteriores consistentes con esta opinión.

Lo acordó y manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez concurre con el resultado sin opinión. El Juez Asociado señor Kolthoff Caraballo disiente con opinión. La Juez Asociada señora Rodríguez Rodríguez emitió la expresión siguiente, a la cual se unió el Juez Asociado señor Colón Pérez:

> "La Juez Asociada señora Rodríguez Rodríguez concurre con las expresiones que se consignan en la Opinión mayoritaria en torno al carácter privativo del derecho moral de autor al amparo

de la *Ley de Derechos Morales de Autor de Puerto Rico*, Ley Núm. 55-2013. Por otro lado, disiente del resultado alcanzado por una mayoría de este Tribunal en cuanto al carácter privativo de la obra física original".


                              Juan Ernesto Dávila Rivera
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Margarita Rosado Muñoz,
David Rosado Núñez,
Christopher Rosado Goldstone
como miembro de la Sucesión
Julio Rosado del Valle

    Peticionarios               CC-2014-1003
    Certiorari

      v.

Sonia Acevedo Marrero

    Recurrida

Opinión Disidente emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 23 de noviembre de 2016.

El presidente preside, el cirujano a operar, el carpintero al martillo y el panadero a amasar. Cada cual en su camino, cada cual en su lugar, y no hay nación sin presidente ni desayuno sin pan. Lo anterior son unos versos de una canción que escribí hace muchos años. Lo que implica es la realidad de que cada persona que con dignidad lleva a cabo una profesión u oficio es importante. Así también lo son **los cónyuges** de estas personas con los cuales -por voluntad propia y en ausencia de capitulaciones matrimoniales- han formado mediante la institución del matrimonio una sociedad legal de gananciales. Tan importante es el **cónyuge** del cirujano o cirujana que lleva a cabo su cirugía en nuestros centros supra

terciarios, como el **cónyuge** del pintor o la pintora que plasma su arte en un hermoso cuadro o mural. Tan importante es el **cónyuge** del empresario o empresaria, o empleado o empleada asalariado o asalariada que contribuye con su esfuerzo a la economía o al servicio público o privado, como el **cónyuge** del cantautor o cantautora que con su música llena para siempre de sensibilidad y emoción el alma colectiva de esta Patria. Entonces, ¿por qué tratar innecesariamente a estos cónyuges de manera distinta?

En esta ocasión, nos corresponde determinar si el **"medio tangible de expresión"** en el que un autor plasmó una creación original durante la vigencia de su matrimonio bajo el régimen de sociedad legal de gananciales tiene presunción de ganancialidad. Ello con el propósito de resolver si los cuadros creados por el pintor Julio Rosado del Valle como parte de su trabajo durante su matrimonio (y que no han sido explotados, por lo que se encontraban como parte de las obras que éste dejó al morir) son de carácter privativo o ganancial. Para esta faena debemos armonizar las disposiciones sobre el régimen económico matrimonial y el derecho moral de autor.

**La Opinión Mayoritaria expone lo siguiente: "[c]iertamente nuestro ordenamiento jurídico distingue los derechos de autor[,] del medio tangible de expresión[,] como sostiene la [Sra. Sonia Acevedo Marrero], asimismo las obras en cuestión fueron creadas por el esfuerzo de su**

**esposo vigente el matrimonio, pero esto no es suficiente para sostener la gananciabilidad de una obra original de arte plástico que no ha sido explotada**".[59] De esta forma, una mayoría de este Tribunal reconoce que los cuadros ("medios tangibles" donde se plasmó la expresión) se produjeron por el esfuerzo del esposo vigente el matrimonio, pero expresa que clasificar los cuadros como gananciales sería incompatible e irreconciliable con el derecho moral de autor. Por tal razón, la mayoría resuelve que los cuadros son privativos y que "las **obras que no han sido vendidas ni cedidas,** son parte del caudal hereditario y transmisibles de conformidad con el derecho de sucesión".[60] Respetuosamente entiendo que esta conclusión, en lugar de armonizar los intereses y propósitos del régimen económico matrimonial y el derecho moral de autor, tiene el efecto de descartar indebidamente el régimen económico del matrimonio. Me explico.

En nuestro ordenamiento jurídico: (1) existe una presunción de gananciabilidad por la industria, sueldo o trabajo de los cónyuges; (2) se distinguen "los medios tangibles de expresión" del derecho moral y se reconoce que el derecho moral subsiste aunque el autor no sea el titular del medio tangible; (3) no existe legislación que disponga que los "medios tangibles de expresión" deben clasificarse como privativos; (4) **se ha interpretado que el derecho**

---

[59] (Énfasis suplido). Véase Ponencia Mayoritaria, pág. 35.
[60] (Énfasis suplido). Véase Ponencia Mayoritaria, págs. 3 y 36.

moral no es absoluto, pues éste debe reconciliarse con otros intereses individuales y sociales y (5) existe una forma de armonizar el régimen económico de sociedad legal de gananciales con el derecho moral sin tener que clasificar los cuadro como bienes privativos, como explico en esta ponencia disidente.

Aun así, la mayoría de este Tribunal se sostuvo en la creación de una nueva categoría de bienes privativos fundados únicamente en la supuesta incompatibilidad del derecho moral con las características de la sociedad legal de gananciales.

Además de concluir que los cuadros son bienes privativos del artista, la mayoría dispone que "tan pronto dicha obra se traduce en beneficios económicos el cuadro de privatividad antes descrito cede y por lo tanto, la Sociedad Legal de Gananciales tiene derecho a los frutos que esta genere vigente el matrimonio, así como aquellos derechos que le reconoce nuestro ordenamiento jurídico sobre los bienes privativos".[61] Ello tiene el efecto de validar parcialmente el dictamen del Tribunal de Primera Instancia donde se dispuso que "lo único que advino ganancial fue el ingreso de la venta de la obra, el cual conforme a la prueba ya fue distribuido".[62] Si bien nuestro ordenamiento concibe que el matrimonio puede percibir los frutos, rentas o intereses de un bien privativo, lo cierto

---

[61] Véase Ponencia Mayoritaria, pág. 37.
[62] Sentencia Parcial del Tribunal de Primera Instancia, Apéndice, pág. 482.

es que el producto de la **venta** de un bien privativo mantiene su carácter privativo y no se vuelve ganancial por el hecho de su venta. En lo pertinente, sobre los bienes privativos, la sociedad legal de gananciales tiene derecho: (1) a los frutos, rentas o intereses de un **bien privativo**, sin que sea necesario que ellos ocurran por el esfuerzo de uno de los cónyuges y (2) al incremento de valor sobre un **bien privativo**, si se prueba que el aumento fue el resultado del esfuerzo de uno de los cónyuges durante el matrimonio.[63] El primer derecho surge del inciso 2 del Art. 1301 del Código Civil, *infra*, y el segundo surge del inciso 3 del Art. 1301 del Código Civil, *infra*.

Habiéndose aceptado en la Ponencia Mayoritaria que los cuadros se produjeron como resultado del trabajo del pintor Rosado del Valle durante su matrimonio, la mayoría debió reconocerle expresamente a la sociedad legal de gananciales algún tipo de crédito o beneficio por dicho esfuerzo, por ejemplo, un crédito por el aumento en valor obtenido por el esfuerzo de uno o ambos cónyuges, de haber ocurrido alguno durante el matrimonio. **La determinación mencionada era necesaria, pues, precisamente en esta etapa de los procedimientos la señora Acevedo Marrero solicitó que se le reconociera a la sociedad legal de gananciales un interés o crédito sobre los trabajos de su esposo durante el matrimonio.** Recuérdese que "[c]uando el causante fuese

---

[63] Véanse: <u>Alvarado v. Alemañy</u>, 157 DPR 672, 681 (2002); <u>Calvo Mangas v. Aragonés Jiménez</u>, 115 DPR 219 (1984).

casado, antes de realizar la liquidación de su herencia hay que proceder a separar sus bienes de los de su cónyuge, y en el caso de existir la sociedad legal de gananciales habrá también que liquidar dicha sociedad, según las reglas propias de la misma", incluyendo la realización de un inventario con los créditos.[64] De esta forma, el cómputo del valor de los cuadros debería realizarse antes de la liquidación de la herencia, y dicho cómputo deberá efectuarse aunque éstos no se hubiesen explotado económicamente durante el matrimonio.

Aunque el reconocimiento del beneficio antes sugerido a la sociedad legal de gananciales por el trabajo de un cónyuge sobre un bien privativo produciría un resultado más completo que lo ahora expuesto en la Ponencia Mayoritaria, ello presenta unas serias dificultades para armonizarlo con nuestro estado de Derecho. Me explico. Según la mayoría, el esfuerzo del cónyuge pintor tuvo el efecto de convertir materiales gananciales en un bien privativo. Sin embargo, como expuse, ese mismo esfuerzo o trabajo, bajo nuestro ordenamiento, es el que requeriría reconocer a la sociedad legal de gananciales un derecho a percibir el aumento de valor resultante del esfuerzo del cónyuge autor durante la vigencia del matrimonio. **Me pregunto, ¿cómo puede un mismo esfuerzo convertir un bien ganancial en privativo y a su vez generar un beneficio o crédito ganancial para la sociedad legal de gananciales?**

---

[64] <u>Méndez v. Ruiz Rivera</u>, 124 DPR 579, 587 (1989).

**Además de contravenir nuestro ordenamiento jurídico, la clasificación de los "medios tangibles" como bienes privativos provoca unos serios problemas en su aplicación.** En particular: ¿cuál sería el precio base del bien privativo (aquel que le pertenecería exclusivamente al autor) y desde cuando se determina o computa?; ¿desde qué momento podría comenzar un aumento de valor?; ¿cómo se podría separar el aumento de valor natural del bien privativo (privativo, por ejemplo, el pasar del tiempo o una tendencia en el arte) de aquel ocurrido por el esfuerzo de un cónyuge (ganancial)?; ¿sobre qué bienes la sociedad legal de gananciales va a cobrar su crédito si el tribunal ya determinó que los cuadros son privativos y señaló que éstos deben ir directamente al caudal hereditario? Entonces, ¿se deberá presentar prueba sobre el valor de cada uno de los cuadros (son decenas de cuadros no vendidos) en las distintas etapas del matrimonio y determinar cuál aumento, de existir alguno, se produjo por el trabajo de los cónyuges (ganancial) y cuál fue un resultado natural (privativo). Sin duda, esto es un ejercicio complicado, intenso y minucioso.

Debido a que considero que es posible armonizar los intereses de las distintas disposiciones legales aplicables sin tener que llegar a la conclusión esbozada en la Ponencia Mayoritaria, respetosamente disiento.

I

El maestro Julio Rosado del Valle fue un reconocido artista puertorriqueño de fama internacional que se dedicaba a la pintura como profesión. El pintor creó una cantidad sustancial de obras y llevó a cabo múltiples exposiciones en reconocidas instituciones y museos.

Al momento de su fallecimiento, el maestro Rosado del Valle dejó múltiples cuadros y serigrafías sin vender, algunos producidos durante su matrimonio con la Sra. Sonia Acevedo Marrero (con quien contrajo matrimonio bajo el régimen de sociedad legal de gananciales) y otros con anterioridad al matrimonio. El 6 de abril de 2009, los hijos del maestro Rosado del Valle (Margarita y David Rosado Muñoz) y su nieto Christopher Rosado Goldstone[65] (en adelante, "los herederos"), presentaron una demanda en contra de la señora Acevedo Marrero. En la demanda solicitaron la liquidación de la sociedad legal de gananciales compuesta por ella y el maestro Rosado del Valle y, a su vez, pidieron la partición de la herencia del pintor.

Luego de evaluar la prueba desfilada, el Tribunal de Primera Instancia adjudicó como privativas las obras que el maestro Rosado del Valle donó a la señora Acevedo Marrero antes y durante el matrimonio, pero además resolvió lo siguiente:

---

[65] Christopher es el hijo de Gabriel, quien falleció pendiente el litigio.

[l]as obras creadas por el Maestro Rosado del Valle vigente el matrimonio y **no sujetas a un contrato de explotación** son privativas por tratarse [de] su propiedad intelectual. Consiguientemente, lo único que advino ganancial fue el ingreso que generó la **venta** de la obra, el cual conforme a la prueba ya fue distribuido.[66]

Inconforme, la señora Acevedo Marrero acudió al Tribunal de Apelaciones y señaló que el hecho de que la obra artística se haya o no explotado económicamente es irrelevante para determinar si ésta tiene una presunción de ganancialidad bajo las leyes de Puerto Rico. El Tribunal de Apelaciones revocó al foro primario en cuanto a la titularidad de los cuadros pintados durante el matrimonio (adjudicándola a la sociedad legal de gananciales) y alteró correctamente la cantidad de cuadros donados a la señora Acevedo Marrero.

Ahora insatisfechos, los herederos acudieron en revisión a este Foro y plantean que debemos retomar la postura del foro primario.

**II**

**A.   El derecho de propiedad intelectual**

Comienzo por señalar que la "propiedad intelectual" (también conocida como "derecho de autor") tiene rasgos muy singulares que la distinguen de otros tipos de bienes.[67] Los derechos de autor se componen de los derechos extrapatrimoniales (también denominados "derechos morales", éstos tienen una naturaleza personalísima que protege el

---

[66] (Énfasis suplido). Sentencia Parcial del Tribunal de Primera Instancia, Apéndice, pág. 482.
[67] Ossorio Ruiz v. Srio. de la Vivienda, 106 DPR 49, 52 (1977).

vínculo entre el autor y su creación) y los derechos patrimoniales (llamados derechos de copia o *copyright*, que consisten en el monopolio de la explotación económica de la obra).[68]

**Debo adelantar que el derecho moral, el derecho patrimonial y el "medio tangible de expresión" son bienes y derechos de naturaleza distinta y separable, que surgen de la obra original.**[69] Por ello, estos pueden coexistir en la misma persona, así como también pueden pertenecer a distintas personas.[70] **Es de vital importancia señalar que los derechos morales y el *copyright* surgen desde que el autor fija por primera vez su obra original (*original work*) en un "medio tangible de expresión".**[71] Según la Ley de Derechos Morales, una "obra" es la "creación original literaria, musical, visual (plástica o gráfica), dramática o de las artes interpretativas, artística, o de cualquier otro tipo de las que se producen con la inteligencia y que sea creativa, expresada en un medio, tangible actualmente conocido o que se invente en el futuro".[72] **Un "medio tangible de expresión" es el "objeto material" u "obra física" donde el autor fijó su obra original.**[73] Para que se

---

[68] Véanse: S.L.G. Negrón-Nieves v. Vera Monroig, 182 DPR 218, 224 (2011); Ossorio Ruiz v. Srio. de la Vivienda, supra, pág. 52.

[69] Véanse: 17 USCA sec. 202; Exposición de Motivos de la Ley de Derechos Morales de Autor de Puerto Rico, 31 LPRA sec. 1401j *et seq.* (Ley de Derechos Morales).

[70] Íd. Así lo reconocen los herederos en su Petición de *certiorari* de 21 de noviembre de 2014.

[71] Art. 2 (b) de la Ley de Derechos Morales, 31 LPRA sec. 1401j; 17 USCA secs. 101-102.

[72] Art. 2(d) de la Ley de Derechos Morales, 31 LPRA sec. 1401j(d).

[73] Véanse: Art. 2 (b) de la Ley de Derechos Morales, 31 LPRA sec. 1401j; 17 USCA secs. 101-102.

entienda "fijada" la obra en un "medio tangible" es necesario que el medio utilizado sea lo suficientemente estable para permitir que la obra pueda ser percibida, reproducida o comunicada por un período.[74]

En nuestro ordenamiento regía la Ley de Propiedad Intelectual de Puerto Rico de 1988,[75] la cual fue sustituida por la Ley Núm. 55-2013, conocida como la Ley de Derechos Morales de Autor de Puerto Rico (Ley de Derechos Morales).[76] Esta ley reconoce el derecho moral del autor y lo define como los "derechos exclusivos de un autor sobre su obra que existen por virtud de la relación personalísima entre el autor y su obra".[77] Así, hemos expresado que "[l]o que caracteriza al derecho moral, en contraposición a los derechos patrimoniales, es la zona de intereses que pretende proteger, a saber, la relación personalísima existente entre el autor y su obra".[78] Como expusimos antes, los derechos morales "[s]urgen al momento en que el autor fija su obra en un medio tangible de expresión".[79]

El derecho moral incluye los derechos de atribución (reconocimiento de su condición de autor); de retracto (renunciar a su autoría); de integridad (impedir la alteración de la obra y evitar la destrucción de un

---

[74] Véase 17 USCA sec. 102.
[75] Ley Núm. 96 de 15 de julio de 1988.
[76] 31 LPRA sec. 1401j *et seq*. En este caso atendemos una controversia de derechos morales que surgió luego de la muerte del autor, asunto en el cual no aplica la Visual Artists Rights Act (VARA), Pub. L. No. 101-650, 104 Stat. 5128 (1990).
[77] Véase Art. 2(b) de la Ley de Derechos Morales, 31 LPRA 1401j(b).
[78] S.L.G. Negrón-Nieves v. Vera Monroig, supra, pág. 225.
[79] Art. 2(b) de la Ley de Derechos Morales, 31 LPRA 1401j(b).

original o ejemplar único de la obra, además, frenar la presentación o distribución de obra mutilada, deformada o alterada) y el derecho de acceso (exigir acceso razonable a la obra original o al ejemplar único cuando éste se halle en poder de otra persona).[80] **En síntesis, el derecho moral es "la habilidad de un autor para poder controlar el destino o utilización que se le dé a su trabajo artístico".[81]** Valga destacar que en la Exposición de Motivos de la Ley de Derechos Morales se menciona que el autor puede "prevenir la distorsión o alteración de la obra independientemente de quién sea el dueño actual, tanto del objeto tangible, como del derecho patrimonial o de copia [*copyright*]".[82] Es decir, **la Ley de Derechos Morales reconoce al "medio tangible de expresión" como un bien independiente al derecho moral y al patrimonial. De esta forma, el autor conserva su derecho moral aún después de haber cedido sus derechos patrimoniales (*copyright*) sobre la obra y luego de haber transferido el "medio tangible" donde plasmó su expresión** (por ejemplo, luego de haber vendido los cuadros).[83]

La Ley de Derechos Morales reconoce como autores a las personas que generan una obra, entre ellos: los "escritores, diseñadores, cineastas, pintores, grabadores, arquitectos y cualquier otro creador de objetos de labor

---

[80] Íd.
[81] (Énfasis suplido). Véase Exposición de Motivos de la Ley de Derechos Morales, supra.
[82] Íd.
[83] Íd.

artística, literaria o científica".[84] De lo anterior se desprende que muchas profesiones, industrias y trabajos están protegidos por la Ley de Derechos Morales. Ello implica lógicamente que nuestra interpretación sobre el alcance del derecho moral afectará una cantidad significativa de matrimonios casados bajo el régimen de sociedad legal de gananciales. Esto es, cualquier matrimonio en el que uno o ambos cónyuges sean músico-compositor, arreglista, pintor, escultor, dramaturgo, poeta, entre otros.

Por otra parte, el derecho patrimonial o *copyright* está regulado principalmente por legislación federal.[85] Dicha legislación federal únicamente ocupa el campo en cuanto a 5 derechos: (1) la reproducción de la obra, (2) la preparación de trabajos derivados de la obra protegida, (3) la distribución, (4) la representación y (5) la exposición (exponer una copia).[86] **Destaco que la legislación federal señala claramente que la titularidad de cualquier derecho de *copyright* es distinta a la titularidad del "medio tangible" donde se plasmó la obra.**[87] De esta forma, orienta que la transferencia del "medio tangible" u "objeto material" donde se fijó la obra no constituye una transferencia de los derechos de *copyright*.[88]

---

[84] Véanse Arts. 2 y 24 de la Ley de Derechos Morales, 31 LPRA secs. 1401j y 1401ff.
[85] Véase Federal Copyright Act, 17 USCA sec. 101 *et seq*.
[86] Véase 17 USCA secs. 101 y 106.
[87] Véase 17 USCA sec. 202.
[88] Íd.

**B. El régimen económico matrimonial de sociedad legal de gananciales**

En nuestro ordenamiento jurídico, las personas que se unirán en matrimonio pueden escoger, mediante capitulaciones matrimoniales, el régimen económico que regirá durante su matrimonio.[89] En ausencia de capitulaciones matrimoniales que dispongan un régimen distinto, nuestro sistema legal decreta que la pareja contraerá matrimonio bajo el régimen de sociedad legal de gananciales.[90] Es necesario destacar que **el régimen económico no podrá variarse luego de contraer matrimonio.**

Sobre los **fines principales** del régimen económico de sociedad legal de gananciales, en <u>Int'l Charter Mortgage Corp. v. Registrador</u>, 110 DPR 862, 866 (1981), expusimos que:

En la sociedad conyugal […] los gananciales se dividen por mitad, cualquiera que sea el monto de los aportes de cada cónyuge y aunque uno de ellos no haya aportado nada. […] Hay que añadir que en la sociedad de gananciales la existencia o no de ganancias es accidental; el fin de lucro está excluido por un propósito y destino superior: hacer posible la realización más perfecta de los fines del matrimonio; **la inversión en común por los cónyuges de su capacidad de trabajo y los frutos de sus bienes propios para fomentar una economía que sirva al cumplimiento de sus deberes matrimoniales recíprocos y los de ambos para con los hijos, y para dividir ganancias, si las hubiere, llegado el caso de disolución de la sociedad.**[91]

En cuanto a la participación en los bienes, el Art. 1295 del Código Civil especifica que "[m]ediante la sociedad de gananciales, el marido y la mujer harán suyos

---

[89] Art. 1267 del Código Civil, 31 LPRA sec. 3551.
[90] Íd.
[91] (Énfasis suplido).

por mitad, al disolverse el matrimonio, las ganancias o beneficios obtenidos indistintamente por cualquiera de los cónyuges durante el matrimonio".[92] Este régimen tiene unas características distintas a otras sociedades fundadas en la importancia que tiene la igualdad de los cónyuges para la consecución de los propósitos del matrimonio.

La sociedad legal de gananciales concluye al disolverse el matrimonio por divorcio, nulidad o muerte del cónyuge.[93] Antes de comenzar el proceso de liquidación de los bienes, se debe determinar cuáles bienes son gananciales y cuáles son privativos.[94] Recuérdese que "[c]uando el causante fuese casado, antes de realizar la liquidación de su herencia hay que proceder a separar sus bienes de los de su cónyuge, y en el caso de existir la sociedad legal de gananciales habrá también que liquidar dicha sociedad, según las reglas propias de la misma".[95] Como sabemos, los bienes del matrimonio se clasifican en gananciales o privativos, según definidos en los Arts. 1299 y 1301 del Código Civil, *infra*. El Art. 1307 del Código Civil dispone que **"[s]e reputan gananciales todos los bienes del matrimonio, mientras no se pruebe que pertenecen**

---

[92] Art. 1295 del Código Civil, 31 LPRA sec. 3621.
[93] Véanse Art. 1315 del Código Civil, 31 LPRA sec. 3681; Art. 95 del Código Civil, 31 LPRA sec. 301.
[94] "Lo anterior conlleva la necesidad de identificar aquellos bienes que corresponden privativamente a cada uno de los ex cónyuges, así como aquella parte de los bienes comunes que se haya utilizado para beneficio exclusivo de uno de los comuneros y de las responsabilidades imputables al caudal común". Montalván v. Rodríguez, 161 DPR 411, 457 (2004).
[95] Méndez v. Ruiz Rivera, 124 DPR 579, 587 (1989).

**privativamente al marido o a la mujer**".[96] Ello significa que existe una presunción rebatible de gananciabilidad y el cónyuge que reclame su naturaleza privativa deberá derrotar tal presunción.

El Art. 1301 del Código Civil dispone que son bienes gananciales:

(1) Los adquiridos por título oneroso durante el matrimonio a costa del caudal común, bien se haga la adquisición para la comunidad, bien para uno solo de los esposos.

(2) **Los obtenidos por la industria, sueldo o trabajo de los cónyuges o de cualquiera de ellos.**

(3) Los frutos, rentas o intereses percibidos o devengados durante el matrimonio, procedentes de los bienes comunes o de los peculiares de cada uno de los cónyuges.[97]

Una de las características de un bien ganancial es que "[a]mbos cónyuges serán los **administradores** de los bienes de la sociedad conyugal, salvo pacto en contrario […]".[98] En cuanto a la **disposición** de estos bienes, los Arts. 91 y 1313 se deben interpretar conjuntamente, y estos disponen que se requiere el consentimiento de ambos cónyuges para donar, enajenar u obligar a título oneroso los bienes de la sociedad legal de gananciales, salvo ciertas instancias. El Art. 91 del Código Civil señala que:

Ambos cónyuges serán los administradores de los bienes de la sociedad conyugal, **salvo estipulación en contrario,** en cuyo caso uno de los cónyuges otorgará mandato para que el otro actúe como administrador de la sociedad.

---

[96] (Énfasis suplido). Art. 1307 del Código Civil, 31 LPRA sec. 3647.
[97] (Énfasis suplido). Art. 1301 del Código Civil, 31 LPRA sec. 3641.
[98] (Énfasis suplido). Art. 91 del Código Civil, 31 LPRA sec. 284.

Las compras que con dichos bienes haga cualquiera de los cónyuges serán válidas cuando se refieran a **cosas destinadas al uso de la familia o personales de acuerdo con la posición social y económica de ésta. Disponiéndose, que cualquiera de los cónyuges podrá efectuar dichas compras** en efectivo o a crédito.

Los bienes inmuebles de la sociedad conyugal no podrán ser enajenados o gravados, bajo pena de nulidad, sino mediante el consentimiento escrito de ambos cónyuges. Nada de lo antes dispuesto se interpretará a los efectos de limitar la libertad de los futuros cónyuges de otorgar capitulaciones matrimoniales.[99]

Por otro lado, el Art. 1313 del Código Civil lee como sigue:

No obstante lo dispuesto en [el Art. 91] de este título, ninguno de los dos podrá donar, enajenar, ni obligar a título oneroso, los bienes muebles e inmuebles de la sociedad de gananciales, sin el consentimiento escrito del otro cónyuge, **excepto las cosas destinadas al uso de la familia o personales de acuerdo con la posición social o económica de ambos cónyuges.**

Todo acto de disposición o administración que sobre dichos bienes haga cualquiera de los cónyuges en contravención a esta sección, y los demás dispuestos en este título, no perjudicará al otro cónyuge ni a sus herederos.

**El cónyuge que se dedicare al comercio, industria, o profesión podrá adquirir o disponer de los bienes muebles dedicados a esos fines, por justa causa, sin el consentimiento del otro cónyuge.** No obstante, será responsable por los daños y perjuicios que pudiere ocasionar por dichos actos a la sociedad legal de gananciales. Esta acción se ejercitará exclusivamente en el momento de la disolución de la sociedad legal de gananciales.[100]

**Es importante señalar que las facultades de coadministración y el requisito de consentimiento de ambos cónyuges para la disposición son características secundarias del régimen económico de sociedad legal de**

---

[99] (Énfasis suplido). Íd.
[100] (Énfasis suplido). Art. 1313 del Código Civil, 31 LPRA sec. 3672.

**ganaciales.** Ello se desprende de la jurisprudencia interpretativa, de la realidad de que la coadministración y el requisito de consentimiento de ambos para disponer no existían al momento en que el régimen de sociedad legal de ganaciales fue creado,[101] y de las disposiciones vigentes del Código Civil que establecen unas excepciones al requisito de consentimiento de ambos cónyuges dependiendo de los fines y la naturaleza de los bienes (los Arts. 91 y 1313 permiten que un cónyuge administre y disponga de algunos bienes ganaciales sin el consentimiento del otro cónyuge). Destáquese que el Art. 1313 del Código Civil dispone que "[e]l cónyuge que se dedicare al comercio, industria, o profesión podrá adquirir o disponer de los bienes muebles dedicados a esos fines, por justa causa, sin el consentimiento del otro cónyuge".

Por otro lado, un bien privativo es aquél que pertenece exclusivamente a un cónyuge. El Art. 1299 del Código Civil reconoce como privativos: los bienes que cada uno aporte al matrimonio; los que adquiera por donación legado o herencia; los adquiridos por retracto o permuta de bienes privativos, y los comprados con dinero privativo.[102] Además de los reconocidos en ley, mediante jurisprudencia señalamos que ciertos bienes deben considerarse privativos por su naturaleza personalísima, por ejemplo un título

---

[101] Antes el esposo era el único administrador y representante legal de la sociedad legal de ganaciales. La Ley Núm. 51 de 21 de mayo de 1976 introdujo unos cambios al Código Civil para fomentar la igualdad de los derechos del hombre y de la mujer.
[102] Art. 1299 del Código Civil, 31 LPRA sec. 3631.

profesional.[103] El Art. 92 del Código Civil concede plena libertad sobre los bienes privativos al disponer que "[e]l marido y la mujer tendrán el derecho de administrar y disponer libremente de sus respectivas propiedades particulares".[104]

**C. El derecho moral y el régimen económico de sociedad legal de gananciales**

En López v. González, 163 DPR 275, 285-286 (2004), **definimos "industria, sueldo y trabajo" como las retribuciones que se obtienen del trabajo intelectual y de la práctica de un arte o deporte, y señalamos que estas son de naturaleza ganancial.** En ese caso este Tribunal aún no se había enfrentado a la controversia sobre si los "medios tangibles" donde un autor plasmó su expresión son gananciales. Allí expresamos lo siguiente:

> La industria es una obra de habilidad o destreza. Por trabajo se entiende cualquier actividad humana capaz de producir unos rendimientos económicos. Comprende tanto el trabajo manual como el **intelectual**, el ejercicio de una profesión u oficio, como **la práctica de un arte o deporte** que lleve consigo una compensación económica en forma de sueldo o salario, o cualquier retribución como puede ser un premio o recompensa.
>
> .   .   .   .   .   .   .   .
>
> En fin, tal como lo expresáramos en García v. Montero Saldaña, 107 D.P.R. 319, 330-331 (1978), **"las locuciones industria, sueldo y trabajo... [contenidas en el segundo inciso del Art. 1301 del Código Civil comprenden] todas las formas de retribuir la actividad productora del hombre, y todo ello quiere que se aporte al caudal común de los gananciales, ya se trate de trabajo manual o intelectual en todas sus manifestaciones de utilidad económica".**[105]

---

[103] Véase Díaz v. Alcalá, 140 DPR 959, 968-69 (1996).
[104] Art. 92 del Código Civil, 31 LPRA sec. 92.
[105] (Citas omitidas y énfasis suplido). López v. González, 163 DPR 275, págs. 285-286 (2004).

También en <u>Alvarado v. Alemañy</u>, 157 DPR 672, 679 (2002), expusimos que los trabajos científicos, artísticos y literarios son gananciales, en lo sucesivo:

> Ya se trate de un jornal o salario devengado periódicamente por trabajos manuales de más o menos importancia, ya de sueldos, honorarios o derechos en el ejercicio de un cargo o profesión, ya de los productos de una empresa industrial o mercantil, ya de una recompensa por obras o servicios, ya sean los trabajos industriales, agrícolas, comerciales, **científicos, artísticos o literarios**, ya, en fin, se obtengan los beneficios por uno solo de los cónyuges o por ambos, **todo es ganancial, y todo se entiende pertenecer por mitad tanto al marido como a la mujer**.[106]

Como vimos, en <u>Alvarado v. Alemañy</u>, supra, al interpretar el Art. 1301 del Código Civil, expusimos que "todo es ganancial, y todo se entiende pertenecer por mitad tanto al marido como a la mujer".

Luego de analizar el derecho expuesto, coincido con la afirmación de la página 2 de la Ponencia Mayoritaria donde se reconoce lo siguiente: "[l]as leyes federales y estatales sobre propiedad intelectual ni las disposiciones del Código Civil aplicables a la Sociedad Legal de Gananciales atienden expresamente el alcance y la relación de la propiedad intelectual y este régimen económico". La ley federal de *copyright* no ocupa el campo en cuanto a este asunto. **A esto, añado que la Ley de Derechos Morales ni la legislación federal de *copyright* establecen un régimen económico distinto para los matrimonios de autores; tampoco estas leyes requieren que los medios tangibles se clasifiquen como privativos ni impiden que se apliquen**

---

[106] (Énfasis suplido).

nuestras disposiciones estatales sobre regímenes económicos matrimoniales. **Como discutí, no existe una disposición que impida que los "medios tangibles de expresión" pertenezcan al matrimonio.** De esta forma, la solución a esta controversia yace exclusivamente en nuestra interpretación sobre las disposiciones locales legales aplicables.

Como ya señalé, no existe controversia sobre que la titularidad del "medio tangible de expresión" (en este caso, los cuadros) puede pertenecer a una persona distinta al autor sin que éste pierda su derecho moral. Ahora bien, dadas las consideraciones particulares presentes en esta situación en las que convergen distintos derechos e intereses (la protección del derecho moral del autor y el régimen de sociedad legal de gananciales) debemos contestar lo siguiente: ¿se vería afectado el derecho moral del autor si concluyéramos que la sociedad legal de gananciales es dueña del "medio tangible de expresión" que se produjo como resultado de la industria, sueldo o trabajo de uno de los cónyuges durante el matrimonio?, ¿está el derecho moral en **conflicto irremediable** con el carácter ganancial de la industria, sueldo o trabajo de los cónyuges casados bajo el régimen de sociedad legal de gananciales y con las características de este régimen?, **¿pueden armonizarse las características e intereses de las distintas legislaciones**?

**En** Ossorio Ruiz v. Srio. de la Vivienda**, 106 DPR 49 (1977), discutimos los tres acercamientos al derecho moral, y expresamos claramente que adoptamos el enfoque**

"**ecléctico**". Ecléctico significa que adopta una postura entre doctrinas diversas. **Según descrito, el enfoque "ecléctico" es aquél "que reconoce la índole polifacética de la propiedad intelectual e intenta armonizar los intereses en potencial conflicto".**[107] **Así, en** <u>**Ossorio Ruiz v. Srio. de la Vivienda**</u>**, supra, advertimos que bajo el enfoque adoptado "no puede concebirse el derecho moral como un derecho absoluto", sino que "[d]ebe reconciliársele con otros intereses individuales y [comunitarios]" para evitar "interpretaciones extremas de que debemos cuidarnos".**[108] El análisis adoptado en <u>Ossorio Ruiz v. Srio. de la Vivienda</u>, supra, es acorde a nuestras normas de hermenéutica legal sobre armonización de disposiciones aparentemente conflictivas y tiene el propósito de proteger el derecho moral, a la vez que busca preservar los otros intereses individuales y sociales envueltos.[109]

En la pág. 22 de la Ponencia Mayoritaria se citó la pág. 56 de <u>Ossorio Ruiz v. Srio. de la Vivienda</u>, supra, y se reconoció lo siguiente: "Por otro lado, recalcamos que

---

[107] (Énfasis suplido). <u>Ossorio Ruiz v. Srio. de la Vivienda</u>, supra, pág. 56.
[108] (Énfasis suplido). <u>Ossorio Ruiz v. Srio. de la Vivienda</u>, supra, págs. 55-56.
[109] Por otro lado, "es importante destacar que al realizar un análisis de disposiciones que aparentan ser contradictorias entre sí, los tribunales deben primeramente intentar realizar una interpretación armoniosa de la ley de manera que sus disposiciones se logren hacer compatibles y no contradictorias. Ello se fundamenta en el canon de interpretación hermenéutica sobre lectura armoniosa que exige que al interpretar una ley los tribunales deben armonizar, hasta donde sea posible, todas sus disposiciones con el propósito de lograr una interpretación integrada, lógica y razonable de la intención legislativa". <u>Banco Santander de Puerto Rico v. Correa García</u>, 2016 TSPR 201 (2016).

cuando los derechos de propiedad intelectual deben reconciliarse con otros intereses, cada caso deberá examinarse a la luz de sus propios hechos".

**Conforme a lo señalado, el enfoque hermenéutico de <u>Ossorio Ruiz v. Srio. de la Vivienda</u>, supra, nos obliga a armonizar, en lo que sea posible, los propósitos e intereses del régimen de sociedad legal de gananciales y el derecho moral.** Luego de haber examinado el derecho aplicable, entiendo que el derecho moral **es armonizable** con el régimen económico de sociedad legal de gananciales, siempre y cuando reconozcamos unas limitaciones a las facultades de administración y disposición de estos bienes ("medios tangibles de expresión") que están sujetos a derecho moral. Estas limitaciones se reconocerían con el propósito de que no se concedan al cónyuge no autor las prerrogativas con relación a la obra que son personalísimas del cónyuge autor. Valga recordar, como ya mencioné, que las facultades de coadministración y el requisito de consentimiento de ambos cónyuges para la disposición de bienes gananciales no son características esenciales del régimen de sociedad legal de gananciales. Por tal razón, las limitaciones que reconoceríamos no afectarían el espíritu ni el propósito del régimen económico matrimonial.

De esta forma, al armonizar los intereses envueltos, concluiría que: (1) el derecho moral es personalísimo del autor, es decir, le pertenece exclusivamente a éste; (2) los "medios tangibles de expresión" (por ejemplo, los

cuadros y esculturas) creados durante el matrimonio bajo el régimen de sociedad legal de gananciales tienen una **presunción rebatible de gananciabilidad**, pues fueron "obtenidos por la industria, sueldo o trabajo de los cónyuges o de cualquiera de ellos", lo que cabe bajo la definición del Art. 1301 del Código Civil, *supra*; (3) la facultad de **administración** del cónyuge no autor sobre los "medios tangibles de expresión" se limita a aquellas gestiones de administración que no afecten los intereses del cónyuge autor en torno a su derecho moral, y (4) en cuanto a la facultad de **disposición** de estos bienes, esta se debe ejercitar como dispone nuestro Código Civil, salvo que se afecte el derecho moral o los propósitos de la Ley de Derechos Morales. Por último, debe tenerse en mente que el autor deberá cuidar las obras como buen padre de familia y administrarlas de una manera que beneficie los intereses de la sociedad legal de gananciales.

**En torno a la presunción de gananciabilidad del "medio tangible", esta se encontraría sujeta a la presentación de prueba que la derrote, con el propósito de demostrar que el bien pertenece privativamente a su autor.** Por ejemplo, ello se lograría al presentar prueba que evidencie que el autor no tenía la intención de desprenderse de cierta obra ni la produjo con el propósito de darle un valor pecuniario, es decir, que no la creo como parte de su trabajo, industria o profesión.

Como expuse, tanto el derecho moral como el patrimonial surgen desde el momento en que el autor plasmó su expresión en un "medio tangible de expresión". **Habiéndose logrado una armonización de los derechos de autor con el régimen de sociedad legal de gananciales, y no existiendo controversia sobre que el derecho moral no está condicionado a la titularidad o posesión de la obra, resolvería que el "medio tangible" tiene presunción de ganancialidad desde el momento de su creación, claro con las limitaciones a las facultades de coadministración y disposición del régimen económico matrimonial antes descritas y con la posibilidad de presentar prueba para derrotar la presunción de ganancialidad.** Esto proveería una solución más justa sin tener que descartar el régimen económico matrimonial, en circunstancias como las del caso de autos.

**Debo aclarar que las limitaciones al derecho de propiedad que propongo para estos bienes sujetos a derecho moral se observan también en otras instancias en las que el derecho moral impide que un titular ejerza todas las prerrogativas que le corresponden como dueño del bien.** Por ejemplo, el derecho moral limita el derecho propietario de un comprador al impedir que éste lo mutile o lo destruya. Entonces, **al adoptar lo propuesto en esta disidente, no se estaría creando jurisprudencialmente unas características** *sui generis* **para estos bienes, sino que éstas surgirían al armonizar las leyes aplicables.**

Y es que, sostener que el "medio tangible de expresión" pertenece privativamente a su autor, como propone la Opinión Mayoritaria, tendría el efecto de ignorar el enfoque ecléctico adoptado en <u>Ossorio Ruiz v. Srio. de la Vivienda</u>, supra, y el principio hermenéutico que requiere armonizar las disposiciones en aparente conflicto, lo que tendría como consecuencia la creación jurisprudencial de una nueva categoría de bienes para los matrimonios en los que uno de los cónyuges se dedique a la creación de obras originales. Es decir, se establecería una categoría "élite". En este nuevo régimen económico el cónyuge autor no aportaría a la sociedad legal de gananciales el "medio tangible" producto de su profesión, trabajo o industria, mientras que el cónyuge no artista estaría obligado a aportar **todo** lo generado por su esfuerzo (ya sea industria, sueldo, trabajo o profesión) durante el matrimonio. Ciertamente, al armonizar ambas instituciones -el derecho moral y el régimen de sociedad de gananciales- se hace innecesario permitir tal desigualdad.

Además, y por último, clasificar el "medio tangible" de expresión como privativo, pero señalar que los beneficios y frutos que esta genere son gananciales como concluye la Opinión Mayoritaria, tiene el efecto de alterar nuestra norma de derecho, como expuse en la introducción a esta ponencia disidente.

# III

En este caso no existe controversia, como acepta la mayoría, con relación a que el maestro Rosado del Valle se dedicaba a la pintura, que éste continuó con su pasión hasta el momento de su muerte, y que los bienes que la señora Acevedo Marrero reclama como gananciales fueron creados por la profesión, industria o trabajo de su cónyuge durante el matrimonio (los cuadros son los "medios tangibles" donde se plasmó la expresión).

Como se desprende del derecho citado, los cuadros del artista no caben dentro de una de las clasificaciones de bien privativo que están contempladas expresamente en el Art. 1299 del Código Civil, *supra*, y como expliqué, tampoco deberían clasificarse como bienes privativos porque el "medio tangible" donde se plasmó la expresión es un bien distinto y separable del derecho moral.

Así, y consistente con los postulados de la tan arraigada figura del régimen de sociedad legal de gananciales, **resolvería que los cuadros que fueron creados por el maestro Rosado del Valle durante su matrimonio con la señora Acevedo Marrero cuentan con una presunción de ganancialidad.** Dicha presunción podía ser rebatida si se demostraba: (a) que el pintor los donó a su esposa en cumplimiento con los requisitos de regalo módico en ocasión de regocijo familiar o (b) **que el autor no tenía intención de desprenderse de cierto cuadro ni lo creó como parte de su trabajo, industria o profesión** (en cuyo caso serían

privativos del autor y, por razón de su muerte, pertenecerían a su caudal hereditario).

Del examen del expediente se desprende que la señora Acevedo Marrero sí presentó prueba para rebatir la presunción de gananciabilidad con relación a las obras que le fueron regaladas por su cónyuge artista durante el matrimonio, en ocasión de regocijo familiar. Por tal razón, a ésta le pertenecen privativamente estas obras. Por su parte, los herederos no derrotaron la presunción de gananciabilidad. Además, la única prueba que obra en el expediente es aquella que demuestra que todos los cuadros del maestro Rosado del Valle estuvieron a la venta.

Como discutí, la facultad de coadministración por parte del cónyuge no autor sobre estos bienes gananciales (los "medios tangibles") estaría limitada a aquellas instancias en las que no se perjudique el interés del autor en cuanto a su derecho moral. De los testimonios no controvertidos desfilados en juicio se desprende que la señora Acevedo Marrero era quien ayudaba al maestro Rosado del Valle a planificar las exposiciones de su arte, asistía a su esposo en el mercadeo y la venta de las obras que éste pintaba, cooperaba con la conservación del arte y servía de fuente de inspiración y apoyo para su esposo. **No hallé alguna alegación de que las actuaciones de la señora Acevedo Marrero fueran contrarias al interés del pintor en cuanto a su derecho moral.** Tampoco se desprende que sus actos hubiesen perjudicado el desarrollo y promoción del

arte de su esposo, sino que lo fomentaron e inspiraron para continuar con sus creaciones, en beneficio al propósito perseguido por la Ley de Derechos Morales de permitir el "desarrollo económico, educativo, cultural y creativo de la Isla".[110] **Precisamente en esa confianza debe estar fundado el matrimonio y ésta demuestra que la facultad de coadministración no es totalmente incompatible con el derecho moral de un autor.**

Las guías propuestas en esta Opinión Disidente son suficientes para salvaguardar el derecho moral del autor a la vez que respeta y protege el régimen matrimonial escogido por los esposos.

No intervendría con las determinaciones del Tribunal de Apelaciones en las que dicho foro aumentó la cantidad de cuadros donados a la señora Acevedo Marrero por éstas estar correctamente fundamentadas en la prueba. Sin embargo, modificaría el dictamen recurrido para disponer lo siguiente: (1) el **derecho moral** sobre todas las obras de arte del maestro Rosado del Valle pertenecía al pintor y ahora pertenece a sus herederos por virtud de ley; (2) el arte creado por el pintor antes del matrimonio es privativo y pertenece al caudal hereditario, salvo los cuadros que ya se determinó correctamente que la señora Acevedo Marrero probó que le fueron donados válidamente antes del matrimonio; (3) **los cuadros (los "medios tangibles")**

---

[110] Exposición de Motivos de la Ley de Derechos Morales, *supra*. En este caso aplica la Ley de Propiedad Intelectual de Puerto Rico de 1988, Ley Núm. 96 de 15 de julio de 1988.

**creados por el maestro Rosado del Valle durante su matrimonio tienen una presunción rebatible de ganancialidad.** Tal presunción fue rebatida por la señora la señora Acevedo Marrero, en cuanto a las obras que su esposo le regaló durante el matrimonio en ocasión de regocijo familiar; por su parte, los herederos no presentaron prueba que derrotara la presunción de ganancialidad, por tal razón, el resto de las obras creadas durante la vigencia de la sociedad legal de gananciales y que no fueron vendidas, son gananciales; (4) la mitad de la participación en los bienes de la sociedad correspondía al pintor, y por razón de su muerte, pasó a sus herederos, y (5) la liquidación de los cuadros debe hacerse sin perjuicio del derecho moral que ahora corresponde a los herederos del pintor.

**IV**

Por las razones expuestas, modificaría la Sentencia del Tribunal de Apelaciones y devolvería al Tribunal de Primera Instancia para que continúe con los trámites de conformidad con lo aquí expuesto.

Erick V. Kolthoff Caraballo
Juez Asociado